GULF STATES MANUFACTURERS,
INC., Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross-Petitioner.

No. 77–2406.

United States Court of Appeals,
Fifth Circuit.

Sept. 15, 1978.

James F. Smith, Gary R. Kessler, Atlanta, Ga., for petitioner, cross-respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Marion Griffin, Jesse L. Etelson, Attys., N.L.R.B., Washington, D. C., for respondent, cross-petitioner.

Before SKELTON *, Senior Judge, and FAY and RUBIN, Circuit Judges.

SKELTON, Senior Judge.

This case is before the Court upon the petition of Gulf States Manufacturing, Inc., (hereafter referred to as the "Company"), pursuant to Section 10(f) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 88 Stat. 395, 29 U.S.C. sec. 151, *et seq.*) to review and set aside an order of the National Labor Relations

* Senior Judge of the United States Court of Claims, sitting by designation.

Board issued on June 28, 1977, and reported at 230 NLRB No. 81. The Board filed a cross-application for enforcement. The charging party is the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO (hereinafter referred to as the "Union").

In its decision, the Board held that the Company interferred with, restrained and coerced its employees in violation of Section 8(a)(1) of the Act; that the Company violated Section 8(a)(5) of the Act by refusing to bargain in good faith with the Union; and that the Company violated Section 8(a)(3) of the Act by laying off employees because of their Union membership and by failing to properly or timely recall or reinstate employees after a strike.[1]

The underlying facts giving rise to this controversy are generally as follows. The company manufactures prefabricated metal buildings in a highly competitive industry that is seasonal in character. Because of a depression and business slump in the industry in the early part of 1975, the Company froze all wages on March 1, 1975, and began laying off workmen from time to time in order to meet the economic pressures it was encountering. All of this was done long before there was any labor union activity among its employees.

## I. The Withdrawn Charges Issue

On July 21, 1975, the Union filed a petition seeking to represent the employees of the Company at its Starkville, Mississippi plant as their bargaining agent. An election was ordered to be held on September 12, 1975. On September 11, 1975, the night before the election, the general manager of the Company, Clayton Richardson, made a speech to the employees in which he spoke of the wage freeze of the Company and the freeze on wages existing because of the union election and how long the freezes might last. He also commented on possible changes in work schedules that allowed employees to ride in car pools to and from work if the Union won the election.

The election was held on September 12, 1975, in which a majority of the employees voted for Union representation. The Company filed timely objections on September 17, 1975, in Case No. 26–RC–5064, challenging election procedures and alleging failure to protect the secrecy of the ballot at the election. The Union responded by filing unfair labor charges against the Company in Case No. 26–CA–5812, stating in pertinent part as follows:

"h. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (3) and (5) of the National Labor Relations Act, and these unfair labor practices are unfair labor practices affecting commerce within the meaning of the Act.

"2. Basis of the Charge (Be specific as to facts, names, addresses, plants involved, dates, places, etc.)

---

1. 29 U.S.C.A. § 158(a)(1) provides:
    (a) "It shall be an unfair labor practice for an employer—* * * (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 of this title."
    29 U.S.C.A. § 158(a)(3) provides:
    (a) "It shall be an unfair labor practice for an employer—* * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."
    29 U.S.C.A. § 158(a)(5) provides:
    "(a) It shall be an unfair labor practice for an employer—* * * (5) to refuse to bargain collectively with the representatives of his employees . . ."
    Section 8(d) of the Act, 29 U.S.C.A. § 158(d) defines the obligations of the collective bargaining as follows:
    (d) "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, . . . such obligation does not compel either party to agree to a proposal or require the making of a concession . . ."

"Since on or about September 15, 1975, the above-named Employer, by its officers and agents, has temporarily laid off the following employees and others because of their membership in and activities on behalf of International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO, a labor organization:

| | |
|---|---|
| Joe Kimbrough | Jessy Stallings |
| Jack Griffin | Willie Buford |
| Henry Vaughn | Johnny Oswalt |
| Odell Roberson | Aaron Mitchell |
| Bruce Davis | Steve Carmichal |
| Oddie Harris | Timmy Harrelson |
| Fred Williams | |

The above-named Employer, by its officers and agents, refused to bargain with the above-named labor organization on and after September 15, 1975, by unilaterally changing terms and conditions of employment, specifically laying off employees contrary to its prior practice. By the above and other acts, the above-named employer has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act."

The Union filed additional charges against the Company in Case No. 26–CA–5786. The document containing these charges is not in the record and for that reason we are unable to relate the charges verbatim. However, the Company represents that the charges complained of: (1) the aforesaid speech of general manager Richardson; (2) statements made by supervisor Joe Starnes on September 15, 1975, regarding future enforcement of existing Company rules pertaining to work that had not been strictly enforced before the election; (3) the layoffs by the Company of 20 workmen between September 15 and October 1, 1975, when there had been no layoffs in the four months just before the election; (4) the statement made by supervisor, Ervin Perrigan, to certain employees shortly after the election that he would not be able to help them any more and that in the future they would have to go through their stewards and the President of their Union; (5)

the statement made about two weeks after the election by supervisor John Hayes to employee Joe Malone that the Union had his automatic raise frozen and if the Union had not gotten in he probably would have gotten his raise, and that he might get it if he got a group of people to sign a petition to vote the Union out; (6) the statement of supervisor Hayes to employee Jack Griffith that the Union had the wages frozen; (7) the answer of supervisor Perrigan to employee Richard Harris in November, 1975, who asked about a raise, that "the Union's got things tied up now;" (8) and the statement of Perrigan to Philip Parker that he would not get a raise until the contract was negotiated.

■ We accept the fact that the above charges of the Union against the Company were contained in Case No. 26–CA–5786 for several reasons. The Company says they were and the Board does not deny it. Such charges were considered as unfair labor practices of the Company by the Administrative Law Judge (ALJ) who tried the case, and they are now urged as such by the Board in its brief. Furthermore, it is significant that all of the events mentioned in the charges occurred before the settlement was made and the charges were withdrawn by the Union with the approval of the Board's Regional Director on November 11, 1975, as shown below. Even if the charges were not described in detail or with specificity on the forms used by the Union and furnished by representatives of the Board in filing the charges, they are deemed to have been included because of the "catch-all" phrase on the forms which stated:

"By the above and other acts, the above-named employer has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act."

This court held in *N. L. R. B. v. Central Power & Light Co.*, 425 F.2d 1318 (5 Cir. 1970) that the "catch-all" phrase "by other acts and conduct" in the charges was sufficient to include other acts and conduct if

they are sufficiently related to the specific acts alleged. In that case a charge of an unlawful reprimand of an employee and other violations was held to be sufficient to include a non-solicitation rule even though it was not mentioned in the charges. There the court stated:

"Accordingly, general allegations such as that the employer 'by other acts and conduct * * * interfered with, restrained and coerced its employees in the exercise of their rights guaranteed in section 7 of the Act,' as the charge here alleged, *are legally sufficient to cause inclusion of other acts if they are sufficiently related to the specific acts alleged. And sufficient relation has generally been found between acts that are part of the same course of conduct, such as a single campaign against a union.* Texas Industries, Inc. v. NLRB, 5th Cir. 1964, 336 F.2d 128, 132; * * *." (Emphasis supplied) 425 F.2d 1320.

\*       \*       \*       \*       \*       \*

"In this case, since, the events complained of were all part of the same alleged anti-union campaign, were close together in time, and were clearly covered by the general language of the formal charge, there is little merit to any argument that the first charge did not authorize the Board to complain of the no-solicitation rule." 425 F.2d 1321.

In *Texas Industries, Inc. v. N. L. R. B.,* 336 F.2d 128 (5 Cir. 1964), the court held that charges filed by the Union that alleged generally that the company had "engaged in * * * unfair labor practices within the meaning of" Section 8(a)(1) and (3), and then alleged specifically various acts of coercion against a named employee was sufficient to include unfair labor practices by the company against other employees which were not mentioned in the charges. In that case the court held:

"The original charge filed by the union in this case alleged generally that the company had 'engaged in * * * un-

fair labor practices within the meaning of' § 8(a)(1) and (3), and then went on to allege specifically a discriminatory discharge and various acts of coercion with respect to employee Tadlock. The company maintains that the charge is addressed only to unfair labor practices committed against Tadlock. * * * The Board contends that the general allegation of § 8(a)(1) and (3) violations was sufficient to cover the interrogation of employees other than Tadlock. We agree with the Board.

Section 10(b) of the Acts provides:

'Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board * * * shall have power to issue * * * a complaint stating the charges in that respect * * *.'"

"It is established that this section precludes the Board from issuing a complaint on its own initiative, and that a charge is a prerequisite to the institution of proceedings before the Board. *N. L. R. B. v. Kohler Co.,* 7 Cir. 1955, 220 F.2d 3. However, the charge is not a formal pleading, and its function is not to give notice to the respondent of the exact nature of the charges against him. *N. L. R. B. v. Fant Milling Co.,* 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243; *Consumers Power Co. v. N. L. R. B.,* 6 Cir., 1940, 113 F.2d 38. This is the function of the complaint."

\*       \*       \*       \*       \*       \*

"In the light of these principles, we feel that the general allegation in the charge of violations of § 8(a)(1) was sufficient [to include violations not described]." 336 F.2d 132.

In the instant case, the charges filed by the Union in Case No. 26–CA–5812 contained a general charge that "the above-named employer has engaged in and is engaging in unfair labor practices within the meaning of Section 8(a), subsections (1) and (3) and (5) of the National Labor Relations

Act." The charges in such case also included the "catch-all" phrase of "by the above and other acts, the above-named employer has interfered with, restrained, and coerced employees." We assume that Case No. 26–CA–5786 was filed by the Union on the standard printed form of the Board and that it contained the same general charges and allegations. Consequently, as in *Texas Industries, Inc. v. N.L.R.B., supra*, and *N.L. R.B. v. Central Power & Light Co., supra* the general charges and allegations were sufficient to include all existing related charges of unfair labor practices whether they were specifically described or not. Such charges were close together in time, and the events were all a part of the alleged anti-union campaign of the company, and were covered by the general language of the formal charges.

On November 11, 1975, the Company and the Union settled this part of the controversy by executing the following stipulation:

```
              "United States of America
     Before the National Labor Relations Board
                Region Twenty-Six
```

| | |
|---|---|
| Gulf States Manufacturing, Inc., <br>                           Employer, <br><br>              and <br><br> International Brotherhood of Boiler- <br>    makers, Iron Ship Builders, Black- <br>    smiths, Forgers and Helpers, AFL- <br> CIO, <br>                   Petitioner and <br>        Charging Party(Union) | Case Nos. <br><br> 26-RC-5064 <br> 26-CA-5786 <br> 26-CA-5812 |

```
                    STIPULATION
```

In consideration of the mutual covenants, the undersigned, by and through their attorneys or other authorized representatives do hereby stipulate as follows:

    1. The Employer agrees to withdraw with prejudice its Objections to the Election and Exceptions to the Regional Director's Report on Objections in Case No. 26-RC-5064; and

    2. The Union, in consideration of the Employer's agreement to withdraw its Objections to the Election, agrees to withdraw with prejudice its unfair labor practice charges in Cases Nos. 26-CA-5786 and 26-CA-5812; and

    3. There are no other pending Objections to the Election held in Case No. 26-RC-5064 on September 12, 1975; and

    4. There are no other unfair labor practice charges pending against the Employer by the Union; and

    5. The Union represents that it has been authorized by affected employees in Charge No. 26-CA-5786 and Charge No. 26-CA-5812 to enter into this Stipulation;and

6. The Parties agree that Certification of Representative should issue forthwith and that good faith negotiations shall commence thereafter at mutually convenient dates, times and places; and

7. The Parties hereby agree that this Stipulation shall also constitute a joint request to the Regional Director, Region 26, for withdrawal of the Objections to the Election and all pending unfair labor practice charges and that such withdrawals shall be with prejudice.

International Brotherhood
of Boilermakers, Iron Ship
Builders, Blacksmiths, Forgers
and Helpers, AFL-CIO

Curtis Orman    11-7-75

Gulf States Manufacturing, Inc.
Scott P. Watson    11/5/75 "

This stipulation was submitted by the parties to Raymond A. Jacobson, the Regional Director of the Board in Memphis, Tenn., who approved it on November 11, 1975, by mailing letters to the parties in which he stated:

"This is to advise that I have approved the Withdrawal Request submitted in this matter."

On the same date, the Regional Director certified the Union as the bargaining representative of the Company's employees, in accordance with the stipulation, by issuing a written Certification of Representative, on which appeared the following notation:

"The employer filed objections to the election and exceptions to the Region's findings but by stipulation of the parties, the employer withdrew its objections and exceptions on November 11, 1975, which was approved on this date."

As shown by the stipulation, the Company withdrew all objections and exceptions to the election in case No. 26-RC 5064 with prejudice, and the Union withdrew all unfair labor charges in cases Nos. 26 CA 5786 and 26-CA-5812 with prejudice and represented there were no other unfair labor practice charges pending against the employer by the Union. The *quid pro quo* of the agreement was the certification of the Union as the employees' bargaining repre-

sentative. This settlement was approved, as shown above, by the Regional Director in two different written instruments dated November 11, 1975.

At the trial, the Board made a motion to withdraw the approval by the Regional Director of the above settlement and withdrawal by the Union of its unfair labor charges against the Company described in the stipulation, but the ALJ properly denied the motion.

In the meantime the Union filed unfair labor charges against the Company on February 17, 1976, in case No. 26-CA-6007, in which it attempted to reinstate some of the withdrawn charges. The only new charge in this filing was an allegation that the Company had failed and refused to bargain in good faith with the Union. These charges were amended by the Union on March 19, 1976, and again on April 20, 1976, and again on July 2, 1976. In these various charges, the Union realleged and attempted to reinstate all of the withdrawn charges. The Union filed an additional charge on March 11, 1976, in case No. 26-CA-6049 in which it charged the Company with refusing to reinstate named employees who participated in a strike against the Company.

The Board issued a complaint against the Company on April 20, 1976. This complaint

was amended on June 28, 1976, and again on July 2, 1976. The ALJ consolidated all of the charges and complaints before the trial. The Board included all of the withdrawn charges in its consolidated complaint of July 2, 1976. The Company made a motion to strike the withdrawn charges from the consolidated complaint on the grounds that the Union had withdrawn them with prejudice and could not reinstate them, and the Board could not reinstate them because they were barred by the six months statute of limitation.[2] The ALJ found and concluded that the reinstitution of the withdrawn charges was improper because of the statute of limitations. In addition, he found that while it was the policy of the Board to permit reinstatement of withdrawn charges, beyond the limitations period, where it was warranted by equitable considerations, which policy he must follow, notwithstanding the decision of the court denying enforcement in *NLRB v. Silver Bakery, Inc.,* 351 F.2d 37 (1 Cir. 1965), which the Board does not accept, that there were no equitable considerations in this case to warrant a circumvention of the statutory limitations period. Nevertheless, he allowed the reinstatement of the withdrawn charges on the basis that the charge filed by the Union on February 17, 1976, within the limitations period, was broad enough to allow the Board to include the withdrawn charges in its amended complaint filed July 2, 1976, which was beyond the limitations period, and, therefore, denied the Company's motion to strike. We disagree.

■ It will be recalled that the Union withdrew the charges with prejudice, the effect of which was to forever bar it from reinstating such charges. Consequently, the Union could not and did not reinstate the charges by filing the charge on February 17, 1976. Therefore, when the Board

amended its complaint on July 2, 1976, to include the withdrawn charges, there were no Union charges that had been filed within the limitations period which included or could include the withdrawn charges, either specifically or by means of the "catch-all" phrase on the form, when the Board included them in its July 2, 1976, amendment. Under these circumstances, the Board became the charging party, which is contrary to the plain provisions of the Act, as well as to the decided cases. This court held in *Texas Industries, Inc. v. NLRB, supra*:

"Section 10(b) of the Act provides:

'Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board * * shall have power to issue * * * a complaint stating the charges in that respect * * *.'

It is established that this section precludes the Board from issuing a complaint on its own initiative, and that a charge is a prerequisite to the institution of proceedings before the Board. *N.L.R.B. v. Kohler Co.,* 7 Cir., 1955, 220 F.2d 3." 336 F.2d 132.

In thus becoming the charging party on July 2, 1976, the Board alleged new charges that were barred by the statute of limitations.

■ Furthermore, the Union was not only bound by its agreement to withdraw the charges with prejudice, which prohibited its reinstatement of the charges, but it was also estopped from doing so. The Union represented to the Company that it was withdrawing the charges with prejudice, and it intended for the Company to rely on such representations. The Company did rely upon them and changed its position to its detriment, with a corresponding benefit to the Union. The Union was and is estopped from reinstating the withdrawn

---

2. Section 10(b) of the Act provides in part:

"[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." 29 U.S.C., § 160(b).

charges. Also, the Board is legally and morally bound by the withdrawal arrangement, because it approved the agreement, through its duly authorized Regional Director, who acted within the scope of his authority, and who, at the same time, certified the Union as the bargaining agent as required by paragraph 6 of the stipulation. This made the Board a party to the agreement.

The facts in the instant case are much like those in *N.L.R.B. v. Electric Furnace Co.*, 327 F.2d 373 (6 Cir. 1964). In that case the Union filed an unfair labor charge against the company regarding an event that took place on September 8, 1960, and on January 6, 1961, the Regional Director issued a complaint on the charge. Later, the Union withdrew the charges with the approval of the Regional Director, who, in turn dismissed the complaint. On February 10, 1961, the Union filed another charge. On May 5, 1961, the Regional Director issued a complaint, revoked his previous withdrawal approval and complaint dismissal, and reinstated the previous charge and complaint and consolidated the cases for hearing. The court held that the initial charge was barred by the six months statute of limitations (§ 10(b) of the Act, 29 U.S.C. § 160(b)). The court held:

"This section, which has the effect of a statute of limitations, would clearly prevent a complaint issued in May, 1961, from alleging an unfair labor practice committed in September, 1960. Here, however, the problem is not quite so simple. A timely complaint has been issued on January 7, 1961, but subsequently the charge was withdrawn and that complaint dismissed. Then on May 5, 1961, eight months after September 8, 1960, the Regional Director attempted to retract his withdrawal and reinstate this earlier timely charge. We are of the opinion that his action in doing so is barred by § 10(b). The Board has held that a *withdrawn charge cannot support allegations of unfair labor practices, and to allow its* reinstatement *would circumvent the meaning of § 10(b).* Olin Industries, Inc., 97 N.L.R.B. 130; *Square D Company,* 105 N.L.R.B. 253. See *Local Lodge No. 1424, International Association of Machinists v. N. L. R. B.,* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832; *Wausau Bldg. & Constr. Trades Council,* 123 N.L.R.B. 1484. Thus after the January 7 complaint had been withdrawn and dismissed, it could not be reactivated after the statutory six-month period of limitations had expired." 327 F.2d 375. (Emphasis supplied).

It will be noted that even the dates in that case are about the same as those in the instant case. However, the facts in our case are stronger for the Company than those in that case because here the charges were withdrawn "with prejudice."

In the case of *N. L. R. B. v. Silver Bakery, Inc., supra,* which the Board has refused to accept or comply with, the court held that Section 10(b) of the Act has been applied consistently to bar "reinstated" charges after withdrawal of an original timely charge with the approval of the Board. The court stated:

"Section 10(b) is clearly an ordinary statute of limitations. Cf. *Local Lodge No. 1424 v. N. L. R. B.,* 1960, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832. It has been applied, consistently, so far as we can discover, to bar 'reinstated' charges after withdrawal of an original, timely charge. Cf. *NLRB v. Electric Furnace Co.,* 6 Cir., 1964, 327 F.2d 373; *Olin Industries, Inc.,* 1951, 97 N.L.R.B. 130. There was no statutory basis in the Act for holding the statute to be tolled, and no other ground. The Board's broad proposition that once a complaint has been filed and dismissed only so-called equitable principles determine when it can be revived was created out of whole cloth. From the standpoint of respondents, for whom section 10(b) was enacted, we can think of no good reason why the mere filing of a charge which is withdrawn with the consent of the Board, so that no proceedings are

pending, should leave in the Board a roving discretion to determine that so-called equities warrant the reinstitution of the proceedings without limit of time. The fact that the Board may feel that its discretion is benignly exercised cannot answer the clear purpose of a statute of limitations. The order may not be enforced."

This court held in *N.L.R.B. v. Central Power & Light Co., supra,* that "*a withdrawn charge is no charge at all.*" (Emphasis supplied).

■ Finally, it appears from the record that the Board violated its own rules and regulations contained in Section 10120.5 of the Board's Case Handling Manual under the caption of "Refiling of Same Allegation" which provides:

"A closing of a C case pursuant to a withdrawal request constitutes a disposition of the issues without prejudice; however, the 10(b) period will apply with respect to any refiling of the same allegations. The matter, if reopened, should be considered and handled as a new charge."

When this regulation was called to the attention of the ALJ at the trial by the Company's attorney in objecting to a consideration of the withdrawn charges, counsel for the Board stated:

"A quick answer to that, your Honor, is that it is not a refiling, it's a reinstatement."

Of course, the answer of the Board's counsel was a semantic play on words, as the regulation refers to "refiling" withdrawn allegations and a "reopened" charge. We see no practical difference between "reopening" and "reinstating" the charges. However, the answer of the attorney for the Board is significant for at least two reasons. In the first place, it shows that the Board did not comply with its own rules and regulations. Had it done so, it would have been required to refile or reopen the

allegations as "new charges". In that case, Section 10(b) would have barred them. Secondly, the attorney's statement shows that the Board actually reopened charges that had been withdrawn and that were not pending at the time the Board reinstated them. This made the Board the charging party in violation of the provisions of the Act.

It is well settled that an Executive Agency of the Government is bound by its own regulations, which have the force and effect of law, and the failure of an agency to follow its regulations renders its decision invalid. See *United States v. Nixon,* 418 U.S. 683, 694–696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (State Department); *Cunningham v. United States,* 423 F.2d 1379, 191 Ct.Cl. 471 (1970) (Air Force); *Piccone v. United States,* 407 F.2d 866, 186 Ct.Cl. 752 (1969) (Navy Dept.); *Watson v. United States,* 162 F.Supp. 755, 142 Ct.Cl. 749 (1958) (War Dept.); and *Hanifan v. United States,* 354 F.2d 358, 173 Ct.Cl. 1053 (1965) (Civil Service Commission).

The Administrative Procedure Act (APA) requires each agency to publish in the Federal Register rules of procedure, and substantive rules of general applicability, and statements of general policy adopted by the Agency.[3] However, in 1967 Congress added Pub.L. 90–23, 81 Stat. 54, which provides:

"Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1).

The record in this case does not show whether or not the above regulation contained in Section 10120.5 of the Board's Case Handling Manual was published in the Federal Register. In any event, it was not necessary for it to be so published in order

3. 5 U.S.C. § 552(a)(1).

for it to be binding on the Board in view of the above 1967 exception.

Congress intended by this exception to provide that no person should be adversely affected by a regulation required to be published in the Federal Register but not so published.[4]

It was not material whether the regulation was substantive or procedural in order to bind the Board, so long as its non-observance adversely affected the Company in this case. The Supreme Court considered these questions in *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) where the Bureau of Indian Affairs (BIA) failed to follow its regulations contained in 66 Indian Affairs Manual 3.1.4 (1965) which it admitted were internal and procedural in character, in denying assistance benefits to Indians living "near" a reservation instead of "on" it. The court relied on the above exception to the APA in deciding the case in favor of the Indians, saying:

> "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required. *Service v. Dulles*, 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 539–540, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959)."

> \*    \*    \*    \*    \*    \*

> "Before the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures." 415 U.S. 235, 94 S.Ct. 1074, 39 L.Ed.2d 294.

In *Service v. Dulles, supra,* and *Vitarelli v. Seaton, supra,* the Supreme Court held procedural rules to be binding on the State Department and Department of the Interior, respectively. See also Davis, *Administrative Law of the Seventies*, Sections 5.03–5, Cum.Supp., July, 1977.

In the instant case, the Board's regulations aforesaid required it to refile or reopen the withdrawn charges as new charges, and to handle and consider them as new charges. When it failed to do so it violated its own internal procedures. This violation adversely affected the rights of the Company by depriving it of the defense of limitations afforded by Section 10(b), and was error.

The Company argues that in any event the withdrawn charges were not unfair labor practices by the Company that violated any of the provisions of the Act. We do not find it necessary to decide this question in view of our disposition of this part of the case.

Accordingly, we hold that when the charges were withdrawn with prejudice by the Union on November 11, 1975, they were thereafter null and void and were eliminated from the case and could not be reinstated by the Union at any time, nor by the Board as a charging party before or after the limitations period had run. Therefore, such charges are not before us for decision and we will not consider them. These withdrawn charges include all those events complained of by the Union that occurred prior to November 11, 1975. The Board erred in considering such withdrawn charges and in holding that they were unfair labor practices by the Company that violated Sections 8(a)(1) and (3) of the Act. We deny enforcement of the Board's decision on this part of the case.

## II. The Good Faith Bargaining Issue

Contract negotiations began between the Company and the Union on November 21,

---

4. The House report accompanying this provision stated:

"An added incentive for agencies to publish the necessary details about their official activities in the Federal Register is the provision that no person shall be 'adversely affected' by material required to be published—or incorporated by reference—in the Federal Register but not so published." H.R.Rep.No. 1497, 89th Cong., 2d Sess., 7 (1966), U.S. Code Cong. & Admin.News 1966, pp. 2418, 2424. See S.Rep.No. 813, 89th Cong., 1st Sess., 6 (1965); S.Rep.No. 1219, 88th Cong., 2d Sess., 12 (1964).

1975. At the first and second sessions on November 21 and December 5, 1975, the Union presented a 19-page contract containing their demands under the following comprehensive headings:

1. Union recognition and jurisdiction
2. Union security
3. Checkoff of Dues
4. Management functions
5. Agents of the Union and responsibility
6. Hours of work and overtime
7. Work day defined
8. Work week defined
9. Pay week
10. Overtime pay
11. Double time
12. Holiday overtime pay and no pyramiding
13. Overtime notice
14. Overtime equalization
15. Reporting pay
16. Call-in pay
17. Grievance procedure
18. Arbitration
19. Seniority defined
20. Seniority list
21. Probationary period
22. Transfers
23. Accident and illness
24. Shift preference
25. Military Service
26. Loss of seniority
27. Lay off and recall record
28. Transfers or promotions
29. Leave of absence
     (a) Personal leave
     (b) Union business
30. Working conditions
     (a) Safety and health
     (b) Safety committee
     (c) Medical treatment
31. Holidays and holiday pay
32. Vacations
33. Wages and job classifications
34. Jury duty
35. Funeral pay
36. Christmas bonus
37. Restoration of employee Erwin
38. Insurance
39. Pensions
40. Vending machine profits

The Company presented its proposals at the third meeting held on December 17 and 18, 1975. It was evident from the start that the parties were far apart and that hard bargaining would ensue. This was especially true in view of the divergent proposals and the depressed economic condition of the Company. Also, since the Company had no previous bargaining experience, it naturally sought to include adequate provisions in the contract for the protection of the Company. The differences between the parties were described by the Company generally as follows:

The Union demanded, inter alia, the strongest "Union Security" allowed by law. It offered the Company a "Management Functions" clause which did not specify management prerogatives. The Union proposals included daily overtime; double pay after twelve hours, and double pay for Sunday work and call-ins, and triple pay for hours worked on holidays, more holiday and vacation benefits and liberalized practices, reporting and call-in pay improvements; new leave policies requiring union approval; seniority changes; expanded and changed insurance and pension coverage; extended jury service and funeral leave and pay, and guaranteed Christmas "bonuses"; and a grievance and arbitration provision making all disputed matters subject to arbitration without exception. A "no-strike" commitment by the Union was absent. (The omission was later alleged to have been an "oversight" by the union negotiator.) Wage demands, later proposed, began at 18% "across-the-board" the first year, cost of living adjustments, and would have telescoped wage progressions.

Company proposals afforded the Union such benefits as checkoff for union dues, bulletin board space, and leaves for its union officers to attend conventions. Revised and improved policies and benefits proposed by the Company included premiums for Saturday and Sunday work and advance notice on overtime and work scheduling; improved vacation scheduling; jury pay extension; detailed seniority, transfer and wage protection provisions which extended seniority retention on layoff from 30 days to two months and reduce the length of a probationary period from 120 to 100 days; holiday protection was proposed, with a fixed practice to permit holiday pay to count as hours worked for purposes of computing overtime pay; pension and insurance programs were continued (all costs paid by Company); and many other items of importance to both parties. The Company made a firm proposal on each benefit topic. It elected not to contractually guarantee, as demanded by the Union, the practice of giving Thanksgiving turkeys and Christmas gifts. Company wage proposals were to end the wage "freeze" and to increase rates in classification by 5% the first year. The proposal was improved by adding a new productivity pay system which could provide increases of an additional 9%. Wage increases in the second and third years were also proposed. The proposals of both parties are shown more fully in the discussion below of the 20 meetings they attended.

In order to show the intensity of the bargaining by both parties, and the difference between their proposals, the sessions held on the following indicated dates are described in detail:

(1) November 21, 1975: This first meeting was primarily introductory. The Union was represented by Mr. Orman who presented the first half of its proposals, received certain information previously requested, and requested additional information.

Mr. Smith, representing the Company, pointed out the adverse economic conditions which the Company faced and asked the Union to keep its proposals reasonable. They agreed to withhold negotiations on economic issues until language issues were resolved.

(2) December 5, 1975: The Union presented the remainder of its proposals and these were discussed. The Company complied with the Union's request for information on fringe benefits. The Company rejected the Union's request, made at the first meeting, that Union personnel be paid for the time spent in negotiations. The Company did agree to a scheduling of meetings designed to prevent the employees on the Union Committee from losing work time, or at least limiting the time lost.

(3) and (4). December 17 and 18, 1975: The Company presented its written proposals. These were discussed and the Union pointed out those portions to which it objected.

(5) and (6). January 7 and 8, 1976: Mr. Watson was substituted for Mr. Smith as bargaining attorney for the Company. Mr. Watson asked that the initial proposals be gone over again. The parties had by now had time to study each other's proposals and additional questions were brought out on both sides.

At these meetings the Company proposed a preamble (to which the Union stated that it had no objections), a statement of recognition (to which the Union tentatively agreed), a Purpose and Scope of Agreement Article (to which the Union sought an Amendment inserting a non-discrimination clause; the Company agreeing to the amendment, and the Union thereupon agreeing to the proposal).

The Company's holiday proposal was also discussed. There was agreement as to the number of holidays and the time of each, except for one "floating holiday." The Company sought Company designation of the time of this holiday after consultation with the Union. The Union wanted the time to be set by mutual agreement. The

bulk of the disagreement which remained unresolved as to this article was providing who qualified for the holiday and what was to be the rate of pay for holidays. This second holiday proposal of the Company differed from the first proposal in that it provided that holidays were to be included in time worked when figuring overtime. This change answered an earlier Union objection.

In this meeting the Union and the Company also compromised so as to reach agreement with regard to Reporting and Call-In Pay. In section 1 of that article, dealing with Reporting Pay, the Company proposal provided for 2 hours and straight time. The Union objected and wanted 4 hours. In section 2, dealing with Call-In Pay, the Company had upped its initial offer of 2 hours to 3 hours and was still proposing straight time. With regard to both sections, the Union wanted pay at "the appropriate rate," meaning pay would vary for these hours due to overtime, holidays, and other rates provided in the contract. The Company then agreed to raise its Reporting Pay proposal to 3 hours and to change from straight time to "appropriate rate" with regard to both Reporting Pay and Call-In Pay. Agreement was reached on these terms.

Most of the other proposals were discussed during this meeting with neither side giving much from its original stance.

(7) and (8). January 19 and 20, 1976: During this meeting the Union proposed that the Company pay ½ of the cost of protective glasses and safety boots worn by employees. The employees currently paid all such expenses themselves and the Union's initial proposal had been that the Company pay all of such expenses.

The bulletin board issue was also agreed upon at this meeting. The Company submitted a typed proposal it had brought to the meeting and with one amendment sought by the Union, this was what was agreed upon.

The Company also submitted another proposal on the Grievance and Arbitration Procedure. The Union objected that 5 days was "too long" a period to give the department superintendent to supply his written answer, yet asked for 5 days in which to allow an employee to orally take his grievance to his immediate supervisor, saying the two days proposed by the Company was not enough time for this step.

At this meeting Mr. Orman stated that the Union had no disagreement with the strike and lockout proposal offered by the Company except that it referred to the arbitration and grievance article which was as of yet unsettled.

The Union offered no formal proposals at this meeting. The Union did, however, in response to the Company's proposal of voluntary arbitration with right to strike, say that they desired mandatory final and binding arbitration with a no-strike, no lock-out provision.

The Union stated that they were in a hurry to reach an agreement and the Company agreed to meet on the 27, 28, 29 and 30th of January.

The Company asked the Union to prepare a written wage proposal for the next meeting.

(9). January 27, 1976: The Union did not prepare a written proposal on wages, but gave only an oral proposal. This was the only wage proposal given by the Union. The Company, however, submitted written proposals.

At this meeting agreement was reached as to sections 3 and 5 of the Representation article. Section 5 was new and proposed by the Company to provide for additional union shop stewards, if and when new shifts were created.

The Company also made a minor change in their checkoff proposal, in response to union requests, providing that the Company would give notice to the Union when an employee notified the Company that he wished to quit having the dues deducted from his check. There remained disagreement as to the major matters of arrearages and revocability.

The Company also changed its proposals concerning Hours of Work and Overtime. They added language providing for time and a half for Saturday and Sunday work provided the employee worked all scheduled hours during the week. The previous proposal provided only for time and a half after 40 hours, with no distinction as to Saturday and Sunday. The Union had objected to the Company's initial proposal asking for time and a half on Saturday and double time on Sunday, regardless of whether or not the employee had worked 40 hours during the week.

With regard to the Seniority article, section 2, the Company lowered the probationary period from 120 to 100 days.

The Union made two oral offers: (1) Place the probationary period at 90 days, and (2) Change the Company proposal allowing temporary layoffs for up to 14 days without regard to seniority, by adding for just cause and limiting the term to 7 days. Neither was accepted.

The Union asserted that the Company had reduced its proposals in section 6 of the Seniority article. Originally, § 6(d) has been 4 days, the Union asked for 5, and the new Company proposal was for 3. In § 6(f) the Company had offered 1 year, the Union asked for 2 years, and the Company now proposed 2 months. The Company said this last change was to make this provision consistent with the leave of absence article, such inconsistency previously having been pointed out by the Union, but the change did not solve this question, as the leave of absence article provided for 1 month with up to 1 year upon proven inability to work.

As to § 7 of the Leave of Absence article, the original Company proposal had been to allow employees to reschedule their vacations so as to use vacation time for Union conventions and other Union business. The Company now proposed to allow up to 2 weeks duration per year, provided there remained sufficient personnel to run the Company, without this being part of the employee's vacation, although it was to be without pay by the Company.

(10). January 28, 1976: The Company added to their proposal on Hours of Work Overtime a section guaranteeing "Supervisors or persons excluded from the bargaining unit" the right to continue to do the same type of work and to perform the same type of duties as were performed prior to recognition.

The Union wanted to "clear up some alleged inequities in the classification" as follows: (1) Quality Control man go from a 6 to a 7; (2) Press Operator from a 5 to a 6; (3) Shear Cutback Helper from 2 to a 3; Warehouseman from a 4 to a 5.

The Company, in conjunction with its wage proposal, also desired to clear up some alleged inequities in the classifications, and gave the Union a list of 22 employees whose ratings should be cut, as they were in higher classifications than those provided for their jobs.

The Union also proposed that all employee reprimands be wiped clean so that the employees' records would start clean with the new contract. The Company also submitted a wage proposal.

(11). January 29, 1976: The Company submitted a second wage proposal. In its initial wage proposal the Union had sought an 18% across the board increase the first year with wage adjustments tied to the cost of living in the 2nd and 3rd years. The Company initially proposed a wage increase of approximately 5% the first year and across the board increases of 5% in the 2nd and 3rd years. The Union, noting that the Company's proposals included additional pay steps (some 40 total steps, although men were working at only 18 different steps at that time), proposed a 17% across the board increase the 1st year and 6% in each of the 2nd and 3rd years. The second wage proposal submitted by the Company offered approximately 4% pay raises the 1st year (reduced from the Company's original proposal of approximately 5 per cent) and raises of approximately 5% in the 2nd and 3rd years. In addition, however, the Company was offering productivity pay, to be

paid quarterly, based on the number of man-hours required for each ton of shipped buildings. The payments were to range from .3% at 12.9 man-hours per ton to 9% if the required man-hours were reduced to 9.7 per ton or less. The Union was not at all receptive to this proposal, saying *they* did not consider it as good as the first proposal because they did not like the idea of productivity pay. The Union was opposed to productivity pay because "a number of things could happen that would cut productivity." The Company lowered its original proposal 1% the first year and did not lower it at all for the second year, yet provided for productivity pay which could exceed this 1% figure in each of the years. Furthermore, if the productivity pay amounted to 1% in years 2 and 3, then, when coupled with the 5% liquidated raise it would equal what the Union was seeking in years 2 and 3.

At the end of this meeting on the 29th Mr. Watson, attorney for the Company, informed the Union that he had been in touch with Company officials during the break and that the Company would like to meet again on Saturday for a couple of hours and see if the Company could come up with another proposal.

(12). January 30, 1976: The Company offered its 3rd wage proposal. This was basically the same as the second Company offer, offering only very small increases in pay. At this time, however, the Company orally proposed to drop the demand submitted in conjunction with their previous wage proposals that the wages of 22 employees be reduced. At this time the Company sought to "red-circle" these employees, meaning their present wage scale would not be reduced but they would not receive any wage increase until the salary for their particular job caught up with the salary they were presently being paid. This was in response to very adamant opposition by the Union to the lowering of these employees' salaries.

The Company stated that this was their very tops on money and asked that it be submitted to the membership. The Union agreed, but said that they would not recommend approval. The Union committeemen suggested to the Union, prior to the vote, that the Company felt like the employees would accept anything they offered, and if it was turned down, maybe they would come back with a proposal that would be acceptable.

(13). February 1, 1976: The Union informed the Company that the membership, having been informed by its committeemen of the Company's wage proposal, voted overwhelmingly to reject it, and also authorized a strike.

(14). February 10, 1976: The Company agreed to concede on three points: (1) Cut probationary period down to 90 days (which was the time the Union had earlier solicited from the Company), but retain the provision that stated that insurance coverage would not start for 120 days; (2) on Hours of Work, delete "as schedule dictates" and add "as need requires" (the Union had previously objected to "the Company being able to change the schedule without any reason"); and (3) change the 14-day temporary layoff so as to add "for just cause" (the Union had previously said they would agree to this provision if the Company would add "for just cause" and cut the term to a week).

During this meeting the Company presented another wage proposal to improve the productivity pay formula. The Company also added a provision to the Safety and Health article that for on-the-job injuries an employee would be paid through the end of his shift.

The Union asked Mr. Hudson, the Federal mediator who was present at this meeting for the first time, to set another meeting.

(15). February 13, 1976: The Union, for the first time, took affirmative action regarding the entire contract and gave the Company a list of 5 items saying that if the Company would agree to these 5 items the Union would drop their objections to those

items in the Company's latest proposals to which there had not been an agreement. These 5 items were as follows: (1) Grievance and Arbitration, (2) Hours of Work, (3) Seniority, (4) Checkoff, and (5) Wages. The Union had made some concessions with regard to these 5 items, yet did retain their basic original position (as to wage increase, they dropped their first year demand to 9% and left the 2nd and 3rd years at 6%). The Company caucused and returned saying their final proposal was on the table. That night, at a prearranged meeting, the membership voted to go out on an unfair labor strike.

(February 14–20, 1976, the employees were out on strike. During this period the Company hired replacement employees and gave all employees the raise in wages it had offered the Union, which was the first wage increase in 17 months. On February 20th the Union informed the Company that they were ready to return to work, having called the strike off. They were to be ready to return to work on Monday, the 23rd of February.)

(16). February 27, 1976: The Company asked the Union if it would be willing to meet. The Company took all of its proposals off of the table to reassess them on account of the work stoppage. The Union announced that if the Company was going to take all of its proposals off the table so would the Union.

(17). March 17, 1976: In response to a question from the Company, as to what proposals were presently on the table, the Union announced that only its original proposals were on the table. The Union then asked what the Company had on the table and was told by Mr. Watson that he felt sure that the work stoppage would not affect all of their proposals, but that the Company was still assessing proposals in light of the work stoppage.

(18). April 16, 1976: The Union informed the Company that the 5-item proposal last submitted by the Union was a "one-shot deal" and was not now on the table subject to acceptance by the Company.

The Union and the Company then went through the last proposals offered by the Company. Thus, although not directly stated in the record, it appears that even though the Union refused to place its one-shot 5-item proposal back on the table, the Company had placed its latest proposal back on the table. Mr. Orman, chief negotiator for the Union, said:

(1) That while there was still some disagreement, they were much closer to agreement on Management Rights.

(2) Complete agreement was affirmed as to Preamble.

(3) Mr. Jackson, for the Company, physically marked out the $7,500 salary limitation, which had so bothered the Union and had been mentioned so often, affecting the group insurance plan.

(4) They were closer to agreement on jury pay.

There was also some discussion on employees who had been recalled to work but at a lower classification than they had occupied prior to the strike. The Company responded that recall was by seniority and as jobs opened up. The Company stated that the employees who refused to return at the lower levels would not be penalized and would be called back when their former positions became available.

(19). May 14, 1976: The Union made some minor concessions as to Union security, hours of work, safety equipment payment, vending machine profits, and reinstatement of a discharged employee.

(20). June 15, 1976: For the first time, other than their 5-item proposal, the Union took the responsibility of submitting written proposals. Only minor changes were made from the Union's previous oral proposals. This was the final meeting.

In the meantime, during the contract negotiations, the Union, in addition to instigating and conducting a strike for 6 days, filed 5 charges of unfair labor practices

against the Company. Also, during the same period, the Union caused the Board to issue three complaints of unfair labor practices against the Company. During the strike the employees hired by the Company were subjected to many unpleasant and disturbing experiences, including insulting telephone calls, slashing and cutting of automobile tires, threats and insults from the picket lines as they came to and from work, and other harassing incidents. When the strike was called off by the Union, the Company stopped hiring employee replacements and immediately began to re-hire the striking workers on a seniority basis. By April, 1976, all of the employees who took part in the strike who wanted to be re-employed had been placed in jobs at the Company's plant, although some of them were placed in positions that paid lower wages than the positions they held before the strike. This was caused by the hiring of replacements to fill their previously held positions during the strike. The Company refused to discharge the replacement employees after the strike ended, but did allow the striking employees to resume their old positions as the jobs opened up.

■ Based upon the foregoing complicated chain of events, the Board held that the Company failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act. We do not agree. If the actions of the parties were weighed on hypothetical scales of good faith bargaining, the scales would tilt heavily against the Union and in favor of the Company. As a matter of fact, both parties engaged in hard bargaining and used every economic weapon at their disposal. This they had a right to do. In *NLRB v. Ins. Agents*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) the Supreme Court held that it is permissible for both the employer and the Union to exert economic pressure during bargaining negotiations, and that such activities do not constitute bad faith and are not inconsistent with good faith bargaining. The court said:

"[T]here is simply no inconsistency between the application of economic pressure and good-faith collective bargaining." 361 U.S. 495, 80 S.Ct. 430, 4 L.Ed.2d 467.

While an employer is obligated to bargain in good faith so is the Union. The statute imposes this obligation on both parties. Section 8(d) of the National Labor Relations Act provides:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C.A. § 158(d).

Also, Section 8(a)(5) provides:

"It shall be an unfair labor practice for an employer to refuse to bargain collectively with the representative of his employees." 29 U.S.C.A. § 158(a)(5).

While Section 8(b)(3) provides:

"It shall be an unfair labor practice for a labor organization or its agents to refuse to bargain collectively with an employer." 29 U.S.C.A. § 158(b)(3).

It is clear from the plain words of these provisions of the Act that neither the employer nor the Union can be forced to agree to a proposal of the other party, nor to even make a concession with reference thereto.

In the instant case the Board correctly stated:

"No contention was made that Respondent [the Company] engaged in dilatory tactics, failed to furnish information upon request or committed other 'technical' violations sometimes found in surface bargaining cases. Respondent was willing to meet frequently and for adequate lengths of time; it assumed the bulk of the re-

sponsibility for preparing proposals and writing up agreements."

Accordingly, the Company did not technically violate Section 8(a)(5), since it "was willing to meet frequently and for adequate lengths of time" with representatives of the Union. The record shows that it never at any time refused to meet and confer with the Union during the period of the negotiations extending from November 21, 1975, through June 15, 1976.

It appears that the basis of the Board's holding that the Company did not bargain in good faith was its dislike for and disapproval of the substantive provisions of the Company's proposals on disputed items on which the parties could not agree. These items, and the positions of the parties with regard to them, are briefly described by the Company as follows:

(1) Wage Increase—The Union wanted 9% "across the board" to each employee the first year, with 6% each succeeding year. The Company remained firm on schedule adjustments averaging 5%, 4% and 4% each year, with productivity justifying additional increases of up to 9% each quarter; 22 employees above the rates were "red circled" until increases matched or exceeded their current pay; and the wage freeze instituted the previous March 1 was to be lifted.

(2) Dues Checkoff—The Union wanted a checkoff that would be "irrevocable" for one year. The Company preferred that employees be allowed to revoke, which is consistent with the Mississippi "Right to Work" law.

(3) Seniority—The entire article was agreeable to the Union, except for the length of seniority retention. The Union wanted one year. The practice had been 30 days. The Company offered 2 months.

(4) Hours of Work—Again the entire article, which had included Company concessions on weekend overtime premiums, was acceptable to the union, except that it wanted "daily overtime" after eight hours.

The Company remained firm in its position that this was an exceptionally unwise provision for any "job shop" operation, the cost of which is not within effective control.

(5) Grievance and Arbitration—Here, the Union's position was to demand either the right to strike or compulsory arbitration of all disputes. The Company had offered the former, emphasizing the need for specificity and clarity in labor agreements to arbitrate. Rather than risk being bound by an arbitrator's ruling on matters crucial to its economic health, the Company proposed voluntary arbitration and the right to strike where arbitration was rejected as a determinant of the dispute. Union negotiator Orman professed his "disagreement" with the "limiting" ten-day limit for strike action. No counter-proposal was made by the Union to extend the time period.

(6) Management Rights—The Company wanted the right to subcontract work, change work schedules, impose discipline for just cause, change work rules and to move, sell or consolidate the plant and to separate the employees. The Union objected to subcontracting, unilateral setting of work schedules and the changing of work rules unless reasonable. The Union also wanted the right to strike.

(7) Christmas Bonuses and Thanksgiving Turkeys—The Union wanted the Company to be required to pay a Christmas bonus and to give the employees Thanksgiving turkeys as had been the custom of the Company on a voluntary basis in the past. The Company refused to be bound to make such payments and gifts and insisted they remain on a voluntary basis as gifts by the Company.

The Board's criticism and rejection of the substantive provisions of the Company's proposals is an attempt by the Board to sit in judgment on the terms of the agreement and to dictate the provisions the parties must include in the contract. This is shown by the following excerpts from its decision:

(1) "The management rights clause which Respondent [the Company] pro-

posed and adhered to throughout negotiations, required that the Union yield all bargaining rights on such basic items as sub-contracting, discipline and discharge, the creation of new job classifications and the wage rates applicable thereto _ _ scheduling of hours, the closing or consolidation of part or all of the plant, the separation of the employees if the plant were to be partially or totally closed or consolidated, and the setting of safety and work rules. _ _ _ Respondent's bargaining stance _ _ _ would strip the Union of any effective method of representing its members on the issues of safety and work rules _ _ _ excluding it from any participation in decisions affecting important conditions of employment _ _ _."

These substantive proposals of the Company on management rights were of no concern of the Board. The Company had the right to make them and could insist on them to impasse without violating the Act. *NLRB v. American Nat'l Ins. Co.,* 343 U.S. 395, 409, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), and Section 8(d) of the Statute. Furthermore, the Board had no authority to force the Company to change its proposals. Whether or not the Union could effectively represent its members under the Company's proposals was a matter for the Union to decide and not the Board. The stance of the Board in this regard smacked of partisanship in favor of the Union in an effort to give the Union what it wanted rather than what the parties could agree to. The proper role and function of the Board is to act as a referee and to watch over the bargaining process and not dictate nor guarantee its results. *H. K. Porter v. NLRB,* 397 U.S. 99, 109, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); and *NLRB v. Ins. Agents, supra.*

(2) "Respondent's attempt to exclude the Union from meaningful participation in the role to which the statute entitles it is revealed in its representation, grievance, and Christmas bonus proposals. _ _ _ Respondent's proposals would have excluded the Union from anything more than notification that these wage items were going to be discontinued."

(3) "Respondent's representation proposal prohibited stewards, without written permission, from investigating grievances during the 'normal work day' and 'normal work shift' or on plantsite. *It is difficult to conceive of restrictions which would more inhibit the filing and investigation of grievances."* (Emphasis supplied).

(4) "Assuming that a grievance (narrowly defined by Respondent) surfaced notwithstanding the foregoing restrictions, its future, and the Union's role therein, would be narrowly proscribed. The Union was excluded from the first step of the grievance procedure and was required, under the proposal, to strictly adhere to the time requirements or suffer waiver. Arbitration was to be voluntary, would impose heavy and uneven financial burdens on the Union, and the Union's right to strike rather than arbitrate was not at its own option. It required, and was dependent upon, Respondent's refusal to arbitrate. The right to strike was further encumbered by notice provisions which could seriously weaken the strike as an alternative economic weapon. The notice provision would have required not only notification of the intent to strike, but of the specific date that the strike was to commence. It was thus more stringent than the strike notice requirement incorporated by Section 8(g) into the Act for the Health Care Industry. Moreover, Respondent offered no special justification (such as is present in the Health Care Industry) why it would need such specific notice."

(5) "In the instant case, as in *Tomco Communications,* an 'evaluation of all the Respondent's proposals herein clearly shows that Respondent was determined to force the Union and its members to abandon their right to be consulted regarding practically any and all disputes

that might arise during the term of the contract . . . to waive their statutory rights to bargain collectively.' Even where it could bargain, in those areas not excluded from the grievance procedure, its rights were closely circumscribed by the grievance, arbitration and no-strike provisions."

(6) "I conclude that Respondent's opposition to irrevocable checkoff was intended to frustrate agreement."

(7) "Finally, in assessing the totality of Respondent's actions, it is relevant to consider its wage proposal. While on the surface appearing to have made three successive offers, analysis reveals that the offers were essentially the same. Respondent, as Jackson admitted, knew from the outset what it intended to offer and framed its successive proposals to reach that point. Basically, the three wage offers juggled the same monies, and the last offer would have left most of the employees with a lower wage at the end of 3 years than the earlier offers. The productivity plan, ostensibly providing up to 9 percent in wage increases, in reality offered little if the employer's experience with man-hours per ton of product shipped in the past 3 years is to be any guide."

(8) "The Act, Section 8(d) provides that 'the obligation to bargain collectively does not compel either party to agree to a proposal or require the making of a concession.' However, it is both permissible and necessary to examine the totality of the employer's actions to determine motivation. My examination of that totality leads me to conclude that, as in *Tomco Communications, supra,* Respondent's proposals, from first to last, would have required the Union to abdicate its representational rights and duties, compensating the employees essentially not at all for their loss. I cannot accept the contention that Respondent, in good faith, believed that such proposals could be accepted by the Union or intended to present proposals which stood any chance of acceptance."

"That other unions, in other circumstances, might have accepted some of these terms, or that this union indicated that it would accept some of them if it received something in return, is no evidence of good faith. _ _ _."

The Board relied heavily on its decision in *Tomco Communications, Inc.,* 220 NLRB No. 87 (1975) in deciding the good faith bargaining issue in this case, citing it three times in its decision on such issue. However, the Ninth Circuit Court of Appeals reversed the decision in that case in *NLRB v. Tomco Communications, Inc.,* 567 F.2d 871, decided on January 16, 1978, denying enforcement of the Board's entire decision. It is significant that the court in that case ruled adversely to the decision of the Board on practically every issue that is also present in the case before us. Of particular significance is the decision of that court reversing the holding of the Board that the final offer of the company contained "terms which no self-respecting union could be expected to accept." The court in *Tomco* held:

"The Board's approach is best illustrated when it condemns the Company's final offer as 'terms which no self-respecting union could be expected to accept.' 220 N.L.R.B. at 637. The quotation is from *Reed* and *Prince, supra,* 205 F.2d [131] at 139 (1st Cir.), a case with whose result we have no quarrel, but which contains language we have questioned once before. See *NLRB v. MacMillan Ring-Free Oil Co.,* 394 F.2d 26, 29 (9th Cir., 1968). The utility and appropriateness of a 'self-respecting union' standard are still doubtful. As an analytic tool, the phrase seems rather better suited to conclude inquiry than to advance it. As a test of good faith under the National Labor Relations Act, it directs first attention to the bargaining position of the party whose interests are opposed to the employer. Thus, it comes perilously close to

determining what the employer should give by looking at what the employees want. More relevant in judging of good faith and reasonableness, it seems to us, are other facts such as the employer's economic position and the past level of employee benefits. By those standards, as we have indicated, the Company's proposals cannot be characterized as surface bargaining."

The term "self-respecting union" is at most a vague and general term that has little meaning in the context used by the Board in *Tomco*. We assume that all unions are self-respecting. Therefore, when the Board stated in *Tomco* that no self-respecting union would accept the company's proposals, it was in effect saying that no union would accept them. In our case the Board, in following its decision in *Tomco*, took substantially the same position when it said it could not "accept the contention that Respondent, in good faith, believed that such proposals could be accepted by the Union or intended to present proposals which stood any chance of acceptance." This was the same as saying that no union would accept them. However, the Company proved at the trial that this was incorrect. It produced bargaining contracts that had been accepted and approved by the following unions that contained substantially the same provisions and terms that were embodied in the Company's proposals here:

Textile Workers Union of America Agreement dated January 19, 1976; International Leather Goods, Plastics and Novelty Workers Union Agreement, expiring 11-1-77; United Steelworkers of America Agreement dated December 18, 1973; Textile Workers Union of America Agreement effective December 10, 1972; United Wholesale & Production Workers Union, affiliated with Retail, Wholesale & Department Store Union of America, dated 1969-1972; International Ladies Garment Workers Union Agreement; International Molders and Allied Workers Union Agreement; and American Federation of Government Employees Agreement with the U.S. Equal Opportunity Commission. Other agreements that are part of the record include the 1976 agreement of United Steelworkers Union, where negotiations were concluded by the Company's chief negotiator and that Union during the time bargaining was continuing with the Union in this case.

As a matter of fact, the Company's witnesses testified that its proposals in the instant case were taken for the most part from the language in the above approved union contracts. When confronted with this evidence, the ALJ (and the Board) took a different tack and in effect admitted that unions had accepted the same proposals in other contracts, but then held that this was no evidence of good faith. This holding appears to be inconsistent with, if not contrary to, the holding of the Supreme Court in *NLRB v. American Nat'l. Ins. Co., supra,* where the court approved this method of showing good faith by an employer. The court stated in that case:

"As a matter of fact, a review of typical contract clauses collected for convenience in drafting labor agreements shows that management functions clauses similar in essential detail to the clause proposed by respondent have been included in contracts negotiated by national unions with many employers."

\*    \*    \*    \*    \*    \*

"H.Doc.No.125, 81st Cong., 1st Sess. 3–10 (1949) (U.S. Dept. of Labor Bull.No. 908–12); Collective Bargaining Contracts (B.N.A. 1941) 363–368; Thirty-Seven Classified Provisions of Collective Bargaining Agreements for Wage Earners in the Iron and Steel Industry (American Iron & Steel Inst. 1948) 68–73; Tested Clauses for Union Contracts (Labor Relations Inst. 1945), 11–16; Welty, Labor Contract Clauses (1945), 76–82; Hoebreckx, Management Handbook for Collective Bargaining (1947), 177–182; Smith, Labor Law Cases and Materials (1950), 1008-1011; Industrial Relations Research Service Study No. 1, Manage-

ment's Prerogatives (1945), App.; Pace, Management Prerogatives Defined in Union Contracts (Calif.Inst.Tech. 1945); Teller, Management Functions under Collective Bargaining (1947), 427–437 (23 out of 53 collective bargaining agreements examined by the author contained management functions clauses)." 343 U.S. 405, 72 S.Ct. 830, 96 L.Ed. 1037–8.

In that case good faith bargaining was the main issue before the court.

Thus, the theory of the Board that no union would accept the Company's proposals in the instant case, is factually incorrect. Its holding that even if other unions had accepted them, such acceptance would not be evidence of good faith, appears to be legally incorrect.

It is evident that, for all practical purposes, the Board has substituted itself for the Union at the bargaining table in the following particulars, among others. It has approved what the Union wants and has rejected what the Company is willing to give. By indirection and innuendo, it has required the Company to include proposals in the contract, favorable to the Union, to which the Company has not agreed. By its decision, the Board has attempted to force the Company to make concessions when the law does not require the Company to do so. The Board has assumed the authority to decide what is good and what is bad for the Union, and what the Union would accept, when these are matters for the Union to decide. The Board has condemned the Company of bad-faith bargaining because it has disapproved the substantive contents of the Company's proposals. These partisan actions of the Board show that it has abdicated its role as referee of the bargaining process and has assumed the role of judge of what provisions the bargaining agreement should contain. Substantive collective bargaining proposals are matters to be decided by the employer and the Union and not by the Board or the courts. If there is any principle in labor law that is well settled and firmly established by statute and by the decisions of the courts it is that the Board has neither the authority nor the power to determine, decide, or dictate the substantive terms or conditions of a collective bargaining agreement. As stated above, its role is that of a referee or supervisor of the bargaining process and not that of deciding the substantive issues. These decisions are reserved to the parties involved. The following decisions of this court, the Supreme Court, and other courts make this abundantly clear.

In *American National Ins. Co. v. N. L. R. B.,* 187 F.2d 307 (5 Cir. 1951), affd., *N. L. R. B. v. American Nat'l Ins. Co.,* 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), we held:

"We agree with the petitioner: that the provisions of the contract assailed by the board are not illegal or in anywise forbidden or prohibited; that petitioner had a right to urge and insist upon them; and that the evidence, viewed as a whole, does not  *  *  *  show any refusal of the petitioner to engage in collective bargaining, as that term is defined in the act and in the decisions of the courts."

\*     \*     \*     \*     \*     \*

"While, as the event showed, the union and the petitioner were able to at last agree on a prerogative clause in somewhat modified terms, the union continued throughout to be as vigorously opposed to any clause of that kind as the employer was in favor of it. It was not, therefore, as the board finds, the steadfastness of the employer alone, in insisting on its point. It was the steadfastness of employer and union, the one in proposing, the other in opposing, a clause of this kind, which the employer felt it ought, and the union felt it ought not, to have, which prolonged the negotiations. It was not any general unwillingness on the part of the petitioner to negotiate a contract satisfactory to itself as well as the union."

"Before the enactment of the National Labor Relations Act, as amended, there

was, despite the decisions of the courts to the contrary, some understandable confusion as to what was 'collective bargaining' required of employers. This was due to the persistence of the board in asserting and pressing its view that the use in the National Labor Relations Act of the words 'collective bargaining' meant that the employer had to agree to terms proposed by the union, if in the opinion of the board these terms were reasonable, and that a failure to agree to such terms was a basis for a finding that the employer was not bargaining in good faith. Since, however, that term has been defined in the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(d), there is no longer any basis for differences of opinion as to what it means or for board orders in effect requiring the employer to contract in a certain way." 187 F.2d 309, 310.

In footnote 3 of that case we stated further:

"It is argued further, however, that the intransigeance of respondent is, in itself, evidence of bad faith—that respondent, by its refusal to grant more than minor or meaningless concessions had demonstrated that it did not approach the bargaining table with an open mind—that its conduct has not been that of one seeking agreement. But 'open mind' need not mean a mind without conviction nor need it mean a mind easily swayed by argument." n.3, 187 F.2d 309.

In affirming our decision in that case, the Supreme Court held:

"The National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers. The Act does not compel any agreement whatsoever between employees and employers. Nor does the Act regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement. * * * In 1947, the fear was expressed in Congress that the Board 'has gone very far, in the guise of determining whether or not employers had bargained in good faith, in setting itself up as the judge of what concessions an employer must make and of the proposals and counter-proposals that he may or may not make. [H.R.Rep.No. 245, 80th Cong., 1st Sess. 19 (1947)]. Accordingly, the Hartley Bill, passed by the House, eliminated the good faith test and expressly provided that the duty to bargain collectively did not require submission of counterproposals. [H.R.3020, 80th Cong., 1st Sess., Sec. 2 (11) (1947)]. As amended in the Senate and passed as the Taft-Hartley Act, the good faith test of bargaining was retained and written in § 8(d) of the National Labor Relations Act. That Section contains the express provision that the obligation to bargain collectively does not compel either party to agree to a proposal or require the making of a concession. * * * *And it is equally clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit· in judgment upon the substantive terms of collective bargaining agreements.*" 343 U.S. 401, 72 S.Ct. 828, 96 L.Ed. 1035–1037.

"*Congress provided expressly that the Board should not pass upon the desirability of the substantive terms of labor agreements.* Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the Board." 343 U.S. 409, 72 S.Ct. 832, 96 L.Ed. 1039. (Emphasis supplied.)

In *N. L. R. B. v. Ins. Agents, supra,* the Supreme Court held:

"Since the Board was not viewed by Congress as an agency which should exercise its powers to arbitrate the parties' substantive solutions of the issues in their bargaining, a check on this apprehended trend was provided by writing the good-

faith test of bargaining into § 8(d) of the Act." * * * 361 U.S. 486, 80 S.Ct. 425, 4 L.Ed.2d 462.

"The same problems as to whether positions taken at the bargaining table violate the good-faith test continue to arise under the Act as amended. See *N. L. R. B. v. Truitt Mfg. Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027; *N. L. R. B. v. Wooster Div. Borg-Warner Corp.,* 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823, 828. *But it remains clear that § 8(d) was an attempt by Congress to prevent the Board from controlling the settling of the terms of collective bargaining agreements. N. L. R. B. v. American National Ins. Co.,* 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027, 1037."

\* \* \* \* \* \*

" * * * Congress intended that the parties should have wide latitude in their negotiations, *unrestricted by any governmental power to regulate the substantive solution of their differences.* See *International Brotherhood of Teamsters, C.W. & H v. Oliver,* supra, 358 U.S. 283, at 295, [79 S.Ct. 297, 3 L.Ed.2d 312]." 361 U.S. 487, 80 S.Ct. 426, 4 L.Ed.2d 463 (Emphasis supplied).

This court held in *N. L. R. B. v. I.B.S. Manufacturing Co.,* 210 F.2d 634, 637–638 (5th Cir. 1954):

". . . Long before its opinion in the *American National Insurance* case (*American National Ins. Co. v. N. L. R.B.*), 5 Cir., 187 F.2d 307, affirmed 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027, *this Court had held without varying that the Board could not compel employers and employees to agree to particular provisions in a contract. It emphatically, therefore, rejects the view put out by the Board* and apparently sustained by the court in *Wilson & Co. v. N. L. R. B.,* 8 Cir., 115 F.2d 759, *that a refusal to agree to what, in the opinion of the board, reasonable and fair-minded men ought to be willing to do may be taken to be any indication of a lack of proper intent or of good faith in collective bargaining.* It rejected this for the reason which it made plain in the American National Insurance case in this court and which the Supreme Court in that case, made even more plain. This reason is that the recognition of such a rule would put the board in the position of devising contracts for, and forcing their acceptance upon, employers and employees in accordance with what the board deemed reasonable and fair.

"It is one thing to say that the employer must make a reasonable effort in some direction to compose his differences with the union, if Section 8(a)(5) is to be read as imposing any substantial obligation at all, *N. L. R. B. v. Reed & Prince Mfg. Co.,* 1 Cir., 205 F.2d 131, and *it is entirely another to say that the board may determine what agreements employers ought to make and may then find that if they will not make them they are refusing to bargain in violation of the section. This ought not to be, it is not the law. American National Insurance Co.,* supra, and *Majure v. N. L. R. B.,* supra [5 Cir., 198 F.2d 735] . . ." (Emphasis supplied).

The Ninth Circuit Court stated in *NLRB v. Tomco Communications, supra:*

"A finding of bad faith would require the Company to yield despite the Union's inability to enforce its will through the classic economic weapons of labor relations. But the obligation to bargain collectively 'does not compel either party to agree to a proposal or require the making of a concession.' 29 U.S.C. § 158(d); *American National Insurance,* supra, 343 U.S. at 404, 72 S.Ct. 824; *Queen Mary Restaurants,* supra, 560 F.2d [403] at 411. Nor may the Board, 'directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' *American National Insurance,* supra, 343 U.S. at 404, 72 S.Ct. at 829, cited in *H.K. Porter,* supra, 397 U.S. at 106, 90 S.Ct.

821; *NLRB v. Insurance Agents' Union,* 361 U.S. 477, 487, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). While the parties' freedom of contract is not absolute under the Act, allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract. *H.K. Porter,* supra, 397 U.S. at 108, 90 S.Ct. at 826.

"On the central issue of bargaining intent, the events in question resolve into a case of hard bargaining between two parties who were possessed of disparate economic power: a relatively weak Union and a relatively strong Company. The Company naturally wished to use its advantage to retain as many rights as possible. That desire is not inconsistent with its statutory duty to bargain in good faith. *Chevron Oil Co. c. (sic) NLRB,* 442 F.2d 1067, 1073 (5th Cir. 1971)." Bureau of Nat'l Affairs No. 34, P. E–6.

Finally, on this issue, we quote from our holding in *Chevron Oil Co. v. NLRB,* 442 F.2d 1067 (5th Cir. 1971) as follows:

"As legal justification for its bargaining attitude and conduct Chevron relies upon *National Labor Relations Board v. American National Insurance Company,* 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), wherein the Supreme Court declared that a management rights clause is an appropriate subject for bargaining.[11]

"[11] The Supreme Court, faced with a broad management rights clause and the company's refusal to permit matters relating to hiring, discharging, hours, and working conditions to be submitted to grievance procedures or arbitration, stated, 'Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the Board. If the latter approach is agreed upon, the extent of union and management participation in the administration of such matters is itself a condition of employment to be settled by bargaining.

"Accordingly, we reject the Board's holding that bargaining for the management functions clause proposed by respondent was, *per se,* an unfair labor practice. 343 U.S. at 409, 72 S.Ct. at 832, 96 L.Ed. at 1039.

The Board, while conceding that Chevron's position on the management rights clause is not in itself evidence of a refusal to bargain in good faith, points out that the management rights provision, when coupled with no-strike, no-arbitration clauses, severely restricts the area in which the Union may effectively represent and protect the employees. The Board reasons that the Company's insistence on a combination of clauses that would, in the Board's view, 'undermine the Union's status, authority and prestige as an employee representative' constitutes evidence of the Company's bad faith.

"Although § 8(d) of the Act imposes upon the parties the obligation to meet and confer in good faith with respect to wages, hours and other terms and conditions of employment with a view to the final negotiation and execution of an agreement, the statute specifically provides that this obligation 'does not compel either party to agree to a proposal or require the making of a concession. *Adamant insistence on a bargaining position, then, is not in itself a refusal to bargain in good faith.* Indeed, we stated in *National Labor Relations Board v. Herman Sausage Company, supra* [275 F.2d 229], '*If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate.* Deep conviction, firmly held and from which no withdrawal will be made, may be more than the traditional opening gambit of a labor controversy. It may be both the right of the citizen and essential to our economic legal system * * * of free collective bargaining. *The Government, through the Board, may not subject the parties to direction either by compulsory arbitration or the more subtle means of determining that the position is inherently unreason-*

able, or unfair, or impracticable, or unsound.' 275 F.2d at 231.

"An argument similar to the one made here by the Board was presented to and rejected by this Court in *National Labor Relations Board v. Cummer-Graham Company*, 5th Cir. 1960, 279 F.2d 757. In that matter the company insisted upon the inclusion of a no-strike clause in the contract. The union's acceptance of the clause was contingent upon the inclusion of an arbitration provision, a concession the company refused to make. The Board found that the company had refused to bargain with the union in good faith. We said,

> * * * It may be that most no-strike clauses are accompanied by arbitration provisions. It may be too, that if we were entitled to an opinion, which we are not, we would believe that arbitration would normally be a desirable adjunct of a commitment not to strike. *These are matters for management and labor to resolve, if they can, at the bargaining table. If they cannot there be decided, then neither Board nor Court can compel an agreement or require a concession.* N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027; *White v. N. L. R. B.*, 5 Cir. 1958, 255 F.2d 564; *N. L. R. B. v. Taormina*, 5 Cir. 1957, 244 F.2d 197. We do not think that the Supreme Court held, or intended to hold, in Lincoln Mills, that a no-strike clause and an arbitration clause were so much one that a persistent demand for the one without acquiescing in the other is a refusal to bargain in good faith.

> Contracts containing covenants against strikes are not unknown in the field of labor-management relations. *N. L. R. B. v. Norfolk Shipbuilding & Drydock Corporation*, 4 Cir. 1952, 195 F.2d 632; Scullin Steel Company, 65 N.L.R.B. 1294. The same contention was made in *White v. N. L. R. B.*, 5 Cir. 1958, 255

F.2d 564, as the Board urges here. In the *White* case a finding could have been made that the employer insisted upon a contract by which the employees would surrender their right to strike, and giving to management the right to hire, fire and fix wages without a binding arbitration clause. This insistence, it was held, was not a failure to bargain in good faith. The Sixth Circuit, in a like case, reached a like result. *N. L. R. B. v. United Clay Mines Corporation*, 6 Cir. 1955, 219 F.2d 120. * * * *If the respondent had, and we say it did have, the legal right to insist upon the terms of its proposal, we think it cannot be said that the exercise of the right is evidence of bad faith.* * * * (Emphasis in text) 279 F.2d at 759–760.

"In view of the principles stated above, we are unable to agree with the Board's contention that the Company's position with regard to the management rights, no-strike, no-arbitration clauses warrants a finding of bad faith. *Nor can we agree with the Board's argument that the Company's rejection of the Union's proffered concessions and proposals evidences a refusal to bargain in good faith. The Act does not require an employer to abandon a position because of either the quantity or quality of concessions offered by the Union in the hope of securing that abandonment.* N. L. R. B. v. United Clay Mines Corp., 6th Cir. 1955, 219 F.2d 120.

* * * * * *

"Collective bargaining by its very nature is 'an annealing process hammered out under the most severe and competing forces and counteracting pressures.' *N. L. R. B. v. Dalton Brick & Tile Corp.*, 5th Cir. 1962, 301 F.2d 886, 895. *The Board is charged with the responsibility of overseeing and refereeing the bargaining process, but is not empowered to compel either directly or indirectly, concessions or otherwise sit in judgment upon the substantive terms of the agreement. H. K. Porter Co., Inc. v. N. L. R. B., supra;*

*N. L. R. B. v. Insurance Agents' Intern. Union*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *N. L. R. B. v. American National Insurance Co., supra; M. R. & R. Trucking Co. v. N. L. R. B.*, 5th Cir. 1970, 434 F.2d 689; *N. L. R. B. v. Herman Sausage Co., supra*. It follows that '*it is not for the Board to balance the scales or equalize or neutralize pressures in the name of lack of good faith.*' *M. R. & R. Trucking Co. v. N. L. R. B., supra* at 695." 442 F.2d 1072–1074. (Emphasis supplied).

■ The Board should not be allowed to emasculate and render ineffective Section 8(d) of the Act by an arbitrary finding that the Company had a "bad state of mind" or "improper motivation," simply because it disapproved of the Company's proposals and the long period of time the Company insisted upon their adoption. As Judge Hutcheson stated in speaking for this court in *N. L. R. B. v. I. B. S. Manufacturing Co., supra:* "This ought not to be, it is not the law."

We conclude, as we did in *Chevron Oil Co. v. N. L. R. B., supra,* that in our opinion the matter at hand resolves itself into purely a question of hard bargaining between two parties who used every economic weapon and pressure available to them at the bargaining table. An examination of the detailed description of the bargaining sessions set forth above reveals that they were give and take meetings wherein both parties made concessions on many questions and agreements were reached on many disputed issues. Actually, the parties were not far apart on a complete agreement when the final session was held.

We hold that there is not substantial evidence on the record as a whole to support the Board's finding and conclusion that the Company failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act. Accordingly, we deny enforcement of this part of the Board's order.

III. The Strike, The Wage Increase, and The Re-Hiring of Striking Employees

On February 14, 1976, 90 employees went out on strike. The night before the strike began Mr. Orman, the Union negotiator, called a meeting of the Union members. At the meeting, he told the members that the Union had not been able to reach an agreement with the Company. He solicited instances of unfair labor practices by the Company and some of the members obliged. Mr. Orman recommended that the employees engage in a strike. He wanted instances of unfair labor practices so that the strike could be called an "unfair labor strike" rather than an "economic strike." The strike lasted six days, after which the striking workmen reported to the gates of the plant asking to be put back to work at their old jobs.

■ The overwhelming preponderance and weight of the evidence in the record as a whole indicates that the strike was an economic strike and not an unfair labor strike. The fact that Orman said it was an unfair labor strike did not make it one. Obviously, the only purpose of the strike was to use it as an economic weapon to exert economic pressure on the Company to yield to the demands of the Union at the bargaining table. The Supreme Court in *NLRB v. Insurance Agents, supra,* held that a strike during bargaining negotiations was a legitimate use of an economic weapon by a union to exert economic pressure on an employer, and that its use did not show a failure to bargain in good faith. There does not appear in the record any other purpose or reason for the strike. The fact that the strike only lasted six days is a strong indication that its only purpose was to put economic pressure on the Company.

■ After the strike began, the Company lifted its self-imposed wage freeze that had been in effect since March 1, 1975, due to its depressed economic condition, and unilaterally granted the same wage increase to all employees that it had offered the Union and which the Union had rejected. The Board held that this wage increase was an unfair labor practice of the Company. We do not agree. The wage increase

was granted only after a valid bargaining impasse had been reached and the Union members were out on strike. Furthermore, the increase was exactly the same that had been offered to the Union and rejected by it. Under these circumstances the Company had the right to increase the wages without being guilty of an unfair labor practice. See *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, n.12, 8 L.Ed.2d 230 (1962); *NLRB v. Crompton-Highland Mills,* 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320, 1327; *NLRB v. Bradley Washfountain Co.,* 192 F.2d 144 (7 Cir. 1951); *NLRB v. Florida Citrus Canners Cooperative,* 288 F.2d 630, 639 (5 Cir. 1961); and *NLRB v. Landis Tool Co.,* 193 F.2d 279 (3 Cir. 1951). Actually, the Board agreed that this was true when it stated in its opinion:

"Had Respondent implemented that last offer after a valid bargaining impasse had been reached—Respondent's action would have been lawful. *Midwest Casting Corporation,* 194 N.L.R.B. 523, 1971."

However, the Board found the increase to be illegal by holding:

"No such impasse can exist in the presence of bad faith bargaining, such as is found herein."

We have held *supra* that there was no bad-faith bargaining in this case. Consequently, the holding of the Board that the wage increase was unlawful because of bad-faith bargaining cannot be enforced.

The ALJ found further:

"As I have found that Respondent bargained in bad faith prior to the strike, and unlawfully instituted the wage increase at the beginning thereof, I conclude that the strike was an unfair labor practice strike from its inception."

This finding, which was adopted by the Board, cannot stand. As can be seen above, we have held that the Company did not bargain in bad faith and that the wage increase was not unlawful.

The ALJ found further that the alleged Section 8(a)(1) violations (coercion of employees described below) had no causal connection with the strike. He held:

"Although Orman was careful to bring out at the February 13 meeting evidence of the Section 8(a)(1) violations occurring since the election, so as to attempt to ensure a finding that this was an unfair labor practice strike, I cannot conclude that those violations substantially contributed to the cause or duration of the strike."

This finding was correct and was adopted by the Board.

█ It is well settled that in order for a strike to be an unfair labor strike there must be a causal connection between an unfair labor practice and the strike. See *NLRB v. Birmingham Publishing Co.,* 262 F.2d 2, 9–10 (5 Cir. 1959); and *General Drivers and Helpers Union v. NLRB,* 112 U.S.App.D.C. 323, 325, 302 F.2d 908, 911 (1962). Since there was no bad-faith bargaining, and the wage increase was lawful, and there was no causal connection between the alleged Section 8(a)(1) violations and the strike, there was no unfair labor practice in the case that had any causal connection with the strike or its duration. Therefore, there was no basis on which the strike could be an unfair labor strike. Actually, the General Counsel for the Board did not appear to be convinced that the strike was an unfair labor strike, as he pleaded in the alternative that it was an economic strike.

█ We hold on the record as a whole that the strike was an economic strike and not an unfair labor strike and that the Board's holding to the contrary cannot be enforced.

When the strike began, the Company hired permanent replacements for 21 of the employees who went on strike in order to finish work in progress and keep the company operating. The strike occurred without notice to the Company and it had no way of knowing whether it would last for a week, a month, or a year. The strike took place when the business of the Company

was at a seasonal low, and it was necessary for prefabricated buildings nearing completion to be shipped before the end of the Company's fiscal year on March 1, 1976. Consequently, with resources limited, it was necessary for the Company to hire replacements in order to keep its doors open. This court has held that an employer has the right to maintain its operations during a strike and may hire permanent replacement workers in order to do so. *M.R. & R. Trucking Co. v. NLRB,* 434 F.2d 689 (5 Cir. 1970); and *NLRB v. Florida Citrus Canners Cooperative, supra.*

When the strike was called off after six days and the strikers reported for work, the Company ceased hiring other employees and began to re-employ the strikers on a seniority basis (by agreement with the Union), and without penalty, as jobs became available. However, some of them were not placed in their former positions and received less pay than that previously paid to them. The Union demanded that the replacements be discharged and that the strikers be given their old jobs with the same pay. The Company refused, but did continue re-hiring the strikers as jobs became available, paying them wages fixed for the jobs occupied by them, including the wage increase described above. (At this point the Union did not object to the wage increase, as the workers were glad to get it). By April 12, 1976, all 90 strikers who wanted to return to their jobs had been re-hired.

The Board held that the Company was guilty of an unfair labor practice in violation of Section 8(a)(3) and (1) of the Act because it did not promptly discharge the replacement employees and reinstate all strikers in their old jobs with the same shifts and rates of pay. The Board held further that the strikers were entitled to back pay and to be made whole for their losses during the strike, but left the amounts to be determined in later compliance proceedings.

The Board erred in its decision on these questions. We held in *NLRB v. Florida Citrus Canners Cooperative, supra,* that where the employer had not failed to bargain in good faith at the time of the strike, and the strikers having been replaced, they were not entitled to reinstatement. In that case we stated:

"We think it is clear. that the respondent had not failed in its duty to bargain at the time of the strike. This being so, and the strikers having been replaced and discharged before requesting reinstatement, they are not entitled to reinstatement. *N.L.R.B. v. United States Cold Storage Corporation,* 5 Cir. 1953, 203 F.2d 924, certiorari denied 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 344; *American Federation of Grain Millers, A.F. of L. v. N.L.R.B., supra* [5 Cir., 197 F.2d 451]." 288 F.2d 638.

In *M. R. & R. Trucking Co. v. NLRB, supra,* we held:

"The refusal of the company to reinstate strikers was not a violation of the Act, since the strike was not an unfair labor practice strike." 434 F.2d 696.

Under the circumstances of this case, the Company was not required to reinstate the strikers, but by April 12 all of them had been re-hired. Thus, it appears that the Company was fair and considerate in its re-employment policy and did more in that regard than the law required.

We hold that substantial evidence on the record as a whole does not support the decision of the Board that: (1) the strike was an unfair labor strike; (2) that the wage increase by the Company violated Section 8(a)(5) of the Act; (3) that the failure of the Company to discharge the replacement employees and reinstate the strikers in their old positions with corresponding shifts, rates of pay and back pay, plus other losses during the strike, was a violation of Section 8(a)(3) and (1) of the Act; and (4) that the strikers are entitled to be placed in their former positions with the same shifts and rates of pay together with back pay and compensation for other losses during the strike period, the amounts

to be determined in later compliance proceedings. The decision of the Board on these issues is denied enforcement.

## IV. Post-Strike 8(a)(1) Violations

The ALJ held that supervisors of the Company had interfered with, restrained and coerced its employees in the exercise of their rights under Section 7 of the Act and in so doing had violated Section 8(a)(1) of the Act, as follows:

"About March 16, supervisor Everett Pepper told strike replacement Ralph Borden 'that if any of the boys was to ask me about joining the Union, or to mess with me in any way, don't pay any attention to them and to come and tell him.' Pepper was not called to deny this statement. About mid-April, according to Borden, Wick Malone, the production superintendent, asked him if any of the employees had asked him to join the Union. Malone told him that if they did, he should tell them that he did not know if he had a permanent job. Malone went on to tell Borden that if he did join, he wouldn't have any job because the Company did not want the Union in there.

"Fred Hill, who had been hired during the strike and who, at the time of the hearing was one of Respondent's supervisors, related a similar conversation with Malone. According to Hill, in early April Malone asked him if the employees had been bothering him about the Union. Hill said 'No.' Malone told him that if they did, he should put them off by saying that he might not complete his probationary period. Malone went on to say that all the Union wanted was his name on a card, and cared nothing for him. He concluded by telling Hill that it had been since September 'and it looks like they would understand something . . . They haven't done any good so far . . It would not do them any good.'

"Malone denied speaking to Borden about the Union and testified that his conversations with Hill related to report-

ing or preventing alleged harassment by the former strikers. Noting particularly that Hill was a supervisor testifying contrary to his employer's interest—a factor highly indicative of credibility—that he did not appear eager to testify, that the testimonies of Hill and Borden were so similar as to lend corroboration to both of them, and finding both Hill and Borden to have presented more demeanors than Malone, I credit their versions of the conversations.

"Accordingly, I find that by the directions of Pepper to Borden to report solicitations by other employees and of Pepper and Malone to Borden and Hill to avoid joining the Union, Malone's interrogation of Borden as to whether he had been asked to join the Union and his threat of job loss if Borden joined, and Malone's implied statement that union representation would be futile, Respondent had violated Section 8(a)(1) of the Act."

These were credibility findings by the ALJ and we are usually bound by such determinations even though we might have made different findings had the matter been before us de novo, *NLRB v. Monroe Euipment Co.*, 392 F.2d 559 (5 Cir. 1968) and cases cited therein. Pepper did not deny Borden's statement and, accordingly, the ALJ was justified in finding it to be true. Hill and Borden's testimony about their conversations with production superintendent Malone was denied by Malone but on a credibility basis, the ALJ chose to believe Hill and Borden. We cannot say that the ALJ's findings, adopted by the Board, are not supported by substantial evidence. Therefore, considering the record as a whole, we conclude that there is substantial evidence to support the Board's findings that the Company interfered with, restrained and coerced employees Borden and Hill in violation of Section 8(a)(1) of the Act. The Board's order on this part of the case is enforced.

The Board's order is enforced in part and denied in part.

ALVIN B. RUBIN, Circuit Judge, concurring in part and dissenting in part:

Because my brethren, albeit at great length, have, in my opinion, failed to adhere to the mandate of *Universal Camera Corporation v. NLRB,* 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, with respect to factual conclusions and the proper role of this court in reviewing labor policy determinations made by the Board, I must respectfully dissent.

### I. *The Withdrawn Charges Issue*

The Administrative Law Judge held that charges, based on September, 1975, events and withdrawn in November, 1975, could be considered because they were reasserted in a *new proceeding* filed by the union on February 17, 1976, which was timely. Under the NLRB regulation relied upon by my brethren, quoted at p. 1308, *supra,* the withdrawal simply amounted to a dismissal without prejudice. None of us would say that such a dismissal of a lawsuit (without prejudice and with the court's approval) would bar filing a new suit. It is difficult for me to understand why the similar dismissal of NLRB charges is governed by different principles, and, if it is, by what authority we should undertake to prescribe those principles in this situation.

If I read the majority opinion correctly, it appears to assert:

1. No valid unfair labor charge by the union underlay the complaint filed in 1976 because:

   a. The union was barred by its stipulation from reasserting its withdrawn charges.

   b. The union was estopped, once it achieved recognition without company objection, from reasserting the withdrawn charges.

   c. The Board "became a party" to the stipulation when its Regional Director approved the withdrawal of charges and certified the union.

2. The Board could not conduct proceedings based on the February 17, 1976 charge in any event because:

   a. When the old charges were asserted in a new proceeding, this was not really a new matter because the charges asserted were old charges.

   b. NLRB regulations require the filing of "new" allegations to be treated as a "new" charge for limitations purposes.

   c. Thus, the new proceeding was really not being treated as a new charge, as required, and the Board, in violation of accepted principles of administrative law, violated its own regulations.

Let us discuss the second matter first. The majority does not appear to me to read the regulations correctly. The withdrawal of charges disposes of them *without prejudice.* If they should again be asserted, this must be in a new proceeding. The limitations period must be applied to the subsequent filing; therefore, a new filing, if itself untimely, cannot be deemed timely because the identical charges were once timely filed and then withdrawn. The second filing is not a *refiling* of the same proceeding, but the institution of the identical charges in a new proceeding. The regulation does not refer to "'refiling' withdrawn allegations and a 'reopened' charge," as my brethren assert, p. 1308, *supra*; it refers to the refiling of withdrawn allegations and a reopened *matter,* and says that the two must be treated as a new charge. The Board treated the 1976 filing in just that manner, as a new charge.

That brings us to the question first addressed by the majority: could the Board properly hear charges in the proceeding when the union filed charges in 1976 alleging both the events recited in the prior proceeding and the subsequent refusal of the company to bargain in good faith? In my opinion, the Board acted within the range of its discretion.

The November 5 stipulation, standing alone, should not affect the Board in any way. Even if the stipulation was a contract, and if the filing of charges violated the contract, there is no statute that pre-

vents the Board from acting merely because the charging party filed in violation of a contractual obligation. This did not constitute an unfair labor practice. My brethren cite no authority for their conclusion that the sanction for such a breach of contract is the automatic invalidity of any subsequent proceeding based on charges withdrawn pursuant to a stipulation. Moreover, it is at least arguable that, if the stipulation was a contract, it was bilateral, implied an obligation to bargain in good faith, and that the alleged failure of the company to do so was itself such a breach of contract as to terminate the union's agreement.

Nor do I perceive the basis for invoking an estoppel. It is not evident to me that a company, having withdrawn its objections to certification in return for the withdrawal of charges, is entitled, as a matter of equity, to perpetual immunity from those charges if, having agreed to formal certification, it then arguably refuses to bargain in good faith with the union. To me, the national labor policy embodied in the Act suggests the opposite conclusion.

The Regional Director's letter constituted merely approval of the withdrawal of charges, not approval of the stipulation or an agreement to be bound by it. It reads in full: "This is to advise that I have approved the Withdrawal Request submitted in the above matter." Nor did certification of the union render the Board a party to the stipulation; the company having withdrawn its objections to certification, the NLRB was bound by law to certify the union. Contrary to the assertion in the majority opinion, I find no basis to conclude, "[T]he Board [was] legally and morally bound by the withdrawal arrangement." P. 1307, *supra*.

The NLRB takes the position that it is not estopped from considering charges withdrawn pursuant to a settlement unless the settlement itself has Board approval. *John F. Cuneo Co.*, 1965, 152 NLRB 929, 931 n. 4. The Sixth Circuit has accepted the Board's discretion in such matters, *NLRB v.*

*Zimnox Coal Co.*, 6 Cir. 1964, 336 F.2d 516, and my brethren cite no contrary authority. Of course, we are not bound by the Sixth Circuit's decision, but it lends support to my own belief that, absent persuasive reason to the contrary, this type of question is within the Board's discretion. *NLRB v. Electric Furnace Co.*, 6 Cir. 1964, 327 F.2d 373 is inapposite. In the *Electric Furnace Co.* case, a timely charge was filed, a timely complaint issued, the charge was withdrawn, and the complaint was then dismissed. The issue was whether the *timely complaint* could support a later *untimely complaint* on the same charges absent the filing of any timely charge by the union. Here both the first and the second charges were timely.

## II. *Refusal to Bargain*

This analysis requires me to consider whether the Board properly concluded, on the basis of the once-withdrawn charges, as amplified by the allegations of the company's subsequent failure to bargain, that the Company violated Section 8(a)(1) of the Act. In my opinion, the record contains substantial evidence to buttress the ALJ's opinion and the Board's order based on the charges he reviews. The record contains substantial evidence also that the employer refused to bargain in good faith, in violation of Section 8(a)(3) of the Act.

The ALJ's opinion on good-faith bargaining can be read, in portions, as relying on an assessment of the substantive terms offered by the employer. However, where a charge of bad faith is predicated on accusations of "surface bargaining," some reference to what the company actually proposes is inevitable. Further, unlike *NLRB v. Tomco Communications, Inc.*, 9 Cir. 1978, 567 F.2d 871, this case seems to me to present substantial independent evidence of anti-union animus and "gamesmanship," as the ALJ called it. There is much to be said for the company's position, and the majority opinion fully says it. Certainly there is not a preponderance of evidence to the con-

trary. There need not be; there was substantial evidence, and that is enough.

Because, in my opinion, the Board properly concluded that the impasse in bargaining was the result of bad-faith bargaining, it properly decided that the company's unilateral wage increase was an unfair labor practice. Similarly, I find substantial evidence to support its conclusion that the strike was motivated by an unfair labor practice, bad-faith bargaining, and that, therefore, the company's failure immediately to reinstate the employees was itself an unfair labor practice.

With respect to the final issue, post-strike violations of Section 8(a)(1), I concur with the disposition in Section IV of the majority opinion.

It is not our function to make labor policy or to second-guess the NLRB. We are *Universal-Camera*-bound to view the facts through the Board's lens. I respectfully suggest that the majority has failed to do so.