SOUTHWESTERN BELL TELEPHONE
COMPANY, Petitioner
Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent
Cross-Petitioner.

No. 80–2072.

United States Court of Appeals,
Fifth Circuit.

Feb. 8, 1982.

**472**

James M. Shatto, Houston, Tex., for petitioner cross-respondent.

Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, N. L. R. B., Washington, D. C., for respondent cross-petitioner.

Wm. N. Wheat, Houston, Tex., for Communications Workers of America Local 12222, AFL–CIO.

Before GEE, GARZA and REAVLEY, Circuit Judges.

GEE, Circuit Judge:

This case came before the court upon the petition of Southwestern Bell Telephone Company ("Bell"), filed pursuant to section 10(f) òf the National Labor Relations Act ("NLRA" or "Act"), as amended, 29 U.S.C. § 151 *et seq.*, to review and set aside a decision and order of the National Labor Relations Board ("Board"), issued against it on August 27, 1980. The Board cross applied for enforcement of its order under section 10(e) of the Act. We find that the Board erroneously concluded that the statutory rights of Charles Gottschalk and Mickey Martin were violated and, therefore, deny enforcement.

### The Charles Gottschalk Case

On December 7, 1977, Billy Hubbard, a security officer for Bell, received information that a pair of climbing hooks and a safety belt bearing the Bell system markings were on display at a pawn shop. Because Bell does not sell its equipment, Hubbard suspected that the items had been stolen and pawned and, on December 9, accompanied by a Houston police officer, he went to the shop and obtained the name, address, driver's license number, and physical description of the person who had pawned the equipment in question. Charles Gottschalk was the name provided by the shopkeeper. Hubbard confirmed that Charles Gottschalk in Bell's employ lived at the same address, had the same driver's license number, and fit the physical description provided by the owner of the pawnshop. Based on this information, a meeting was set with Gottschalk for December 14 to allow him an opportunity to give his side of the story.

On the morning of the 14th, Gottschalk's immediate supervisor was informed of the meeting and was requested to make certain that Gottschalk was not sent on any assignments that morning. The supervisor advised Mark McQuiller, the union steward at the work center, that he should remain for the meeting in the event Gottschalk desired union representation. Gottschalk consulted with McQuiller prior to the meeting and was advised not to say anything. At 8:15 a.m., Gottschalk was brought to the office of Garner, Gottschalk's third-level supervisor, for a meeting with Garner and Hubbard. Upon Gottschalk's arrival, Hubbard informed him of what had been learned to that point. At that time, Gottschalk requested the presence of his union representative, and McQuiller was brought to the meeting. McQuiller was informed of what had occurred prior to his arrival, and then Hubbard requested that McQuiller not answer any of the questions put to Gottschalk.[1] Hubbard then proceeded to question Gottschalk about the stolen property.

---

1. The security officer, Mr. Hubbard, made the following request of Mr. McQuiller, according to Mr. Hubbard's testimony on direct examination at the hearing: "I told Mr. McQuiller that I don't want him to answer the questions, but I wanted Mr. Gottschalk to answer the questions, and then after we were through if he had any questions, then he could ask them, but I wanted Mr. Gottschalk to be the one that answers the questions." Mr. McQuiller testified on direct examination at the hearing that Mr.

Hubbard's request took the following form: "At that time, he told me not to say anything or answer any questions that he would pose direct." Tommy Hataway, the general counsel's other witness to the incident, testified at the hearing to the following: "Then, before he went any further, he looked directly at Mark and said, 'I'm going to ask Charles some questions. I don't want you to say anything, I want him to answer in his own words.'"

Gottschalk became highly emotional and stated that, despite McQuiller's previous advice not to say anything, he wished to confess to the theft. The confession was reduced to writing. At the end of Hubbard's questioning, he specifically asked McQuiller if he had any questions or clarifications that he wished to make before Hubbard concluded the interview. McQuiller had nothing to add. Although McQuiller remained silent throughout the interview, at no time did Gottschalk attempt to solicit his advice or counsel. After Hubbard departed, Gottschalk was informed of his suspension pending termination.

■ The Board decided that Bell violated Gottschalk's right to union representation at the December 14, 1977, investigatory interview by requesting the representative not to interfere with questioning. We set aside that decision, finding no such violation.

The right of an employee to have a union representative present at an investigatory interview was established in the companion cases of *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), and *International Ladies' Garment Workers Union v. Quality Manufacturing Co.*, 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975). The Supreme Court concluded that the *Weingarten* right was a derivative of the right of employees to act in concert for mutual aid and protection provided in section 7 of the NLRA, 29 U.S.C. § 151 *et seq.* 420 U.S. at 260, 95 S.Ct. at 965. In reaching this decision, the Court discussed the contours and limits of this statutory right. The fifth provision in the contours and limits is the most relevant to the case at hand. It states:

> Fifth, the employer has no duty to bargain with any union representative who may be permitted to attend the investigatory interview. The Board said in *Mobil*, "We are not giving the union any particular rights with respect to predisciplinary

discussions which it otherwise was not able to secure during collective bargaining negotiations." ... The employer has no duty to bargain with the union representative at an investigatory interview. "The representative is present to assist the employee and may attempt to clarify the facts or suggest other employees who may have knowledge of them. The employer, however, is free to insist that he is only interested, at that time, in hearing the employee's own account of the matter under investigation."

*Id.* at 259–260, 95 S.Ct. at 965.

This provision applies directly to the circumstances of this case. McQuiller was present at the investigatory interview and was allowed to "assist the employee," "to clarify the facts," and to "suggest other employees who may have knowledge of them," but Bell insisted that it was only interested at that time in hearing the employee's own account of what occurred. Bell informed McQuiller of the meeting, allowing him time to consult with Gottschalk. McQuiller did consult with Gottschalk prior to the interview, and McQuiller was told that when Hubbard had completed his interview he would be free to make any additions, suggestions, or clarifications he desired. Gottschalk was not told that he could not consult with McQuiller, and Gottschalk avowed that he was going against McQuiller's advice in making a statement.

■ In the decision in the present case, the Board has, therefore, made an unwarranted extension of the employee's *Weingarten* rights. It is clear that investigatory confrontation without requested union representation is an unfair labor practice, *Lennox Industries v. NLRB*, 637 F.2d 340 (5th Cir. 1981), and an employer cannot discipline an employee for refusing in an investigatory interview to answer questions without union assistance.[2] The union rep-

**2.** In *Good Hope Refineries, Inc. v. NLRB*, 620 F.2d 57 (5th Cir. 1980), an employee was called to an absence counseling interview and refused to answer the personnel manager's inquiries

without the presence of a union representative. The personnel manager told the employee before the meeting that union assistance was unnecessary but acceded to the request, allowing

resentative has the right to make additions and clarifications to the meeting. This right is not without restrictions, however. The limitations in the instant case were within the perimeters set forth by the Supreme Court in *Weingarten* and did not interfere with McQuiller's ability to assist Gottschalk, to clarify facts, or to bring additional relevant facts to Hubbard's attention.[3] We therefore hold that Gottschalk's *Weingarten* rights were not violated.

### The Mickey Martin Case

The NLRB found that Bell had violated section 8(a)(5) and section 8(a)(1) of the NLRA, 29 U.S.C. § 151 *et seq.*, by refusing to provide Martin's union representative photocopies of items in Martin's employee file. We disagree.

On the night of March 22, 1978, employee Martin and his job steward, Terry LaBorde, were requested to attend a meeting with the managers of Bell's mail room operation. At this meeting Martin was informed that he was to be terminated from his position with Bell for falsifying his employment application. Martin stated on his application that he had been involved in only three or four moving violations, and this was contrary to the Texas Department of Public Safety report, which indicated that Martin had eight speeding violations and two negligent collisions. Martin was given the option of resigning by noon the next day without prejudice or notation on his record, or he would be fired. Martin resigned the next morning and never formally complained regarding this meeting.

During the meeting, the manager had the employment application and the Public Safety report, each a one-page document, on the desk in front of him and read off the nature of the violations. There was open discussion of the contents of both documents. From where LaBorde was sitting, he could see the documents, but he did not examine them closely. LaBorde never requested that the documents be handed to him for examination during the meeting. At the end of the meeting, however, LaBorde asked that he be provided copies of the Department of Public Safety report and Martin's employment application. The manager told LaBorde that he did not anticipate any problems in providing the copies, but he wanted to confirm this with his boss the next morning due to his understanding that there was an agreement between the company and the union that the employee needed to sign a form releasing the documents. The next morning the manager told LaBorde that he could not release the documents without Martin's signature on the requesting form. LaBorde again did not ask to read and inspect the documents on the premises. LaBorde was unable to get in touch with Martin to obtain the required signature, and the documents were not released.

The case law is clear that an employer is guilty of violating sections 8(a)(1) and 8(a)(5) of the NLRA if it refuses to provide the union with information that is relevant and necessary to the bargaining function. *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *NLRB v. J. P. Stevens & Co.,* 538 F.2d 1152, 1164 (5th Cir. 1976). The Supreme Court held that refusal to provide the information is refusal to bargain in good faith. 385 U.S. at 435–436, 87 S.Ct. at 567–568. In the instant case, the Board found, and the company does not now dispute, that the information contained in the documents is relevant to the bargaining

a union representative to be present. He resolved the absence questions. Afterward he reiterated that union assistance at the interview was unnecessary and stated that the employee's refusal to answer questions while unassisted constituted insubordination. The personnel manager placed a letter to that effect in the employee's file. The court found that these actions violated the employee's *Weingarten* rights.

3. This case is to be distinguished from *NLRB v. Texaco, Inc.,* 659 F.2d 124 (9th Cir. 1981). There the Ninth Circuit found a violation of the *Weingarten* right when the company, in an investigative interview, refused to allow any participation by the union representative other than passive observation.

function.[4] However, the Board should be estopped from prosecuting the alleged violation[5] because Bell had previously entered into an agreement with the Board in which it was agreed that Bell would:

> Make available, as indicated above, any material contained in the personal history files of bargaining unit personnel. It is understood that the Charging Party may not remove said items from company premises or make copies thereof, but that all such items shall be made available to the Charging Party for use at any step of the grievance proceedings including a hearing before an arbitrator. Any such items introduced in a hearing before an arbitrator shall be made available only subject to an appropriate protective order guaranteeing its confidential nature.

> Make available a duplicated copy of the contents of a personal history file of bargaining unit personnel to the employee grievant in question upon presentation of a written request by said employee grievant.

The agreement was entered into and approved by the regional office of the Board on November 9, 1977. It was approved by the Board in Washington, D.C., on February 1, 1978. The agreed upon enforcement order was sought and obtained at the Board's request from the Fifth Circuit on May 16, 1979. On August 27, 1980, the decision and order in this case was issued by the Board finding a violation for doing exactly what it had approved and sought enforcement of. The actions that the Board now calls a violation of the Act were the very actions that Bell was required to take under the terms of the settlement agreement. The agreement specifies that the party may not remove items from the company premises or make copies thereof but that the company must make copies available upon the written request of the employee. The material in Martin's personal history file was made available to the union representative. The manager summarized the records and freely discussed them with LaBorde. LaBorde saw the records but never asked to examine them on the premises. LaBorde was never denied the right to examine the records but was only denied copies of the documents without having obtained Martin's signature.

■■ The first question to be answered in this case is whether the Board is bound by a settlement agreement to which it is a party. A review of the case law indicates that the Board is so bound. The Board has consistently encouraged compromises and settlements, and these settlements are binding upon the Board unless there is a subsequent independent violation of the Act or a breach of the agreement itself. *Gulf States Manufacturers, Inc. v. NLRB*, 579 F.2d 1298, 1306–07 (5th Cir. 1978); *NLRB v. Southeastern Stages, Inc.*, 423 F.2d 878, 880 (5th Cir. 1970). Further, the Board can be estopped by the terms of a settlement agreement approved by it. In *Gulf States Manufacturers, supra*, a settlement agreement was reached in which the union and the company agreed to withdraw with prejudice the actions they had previously filed with the Board. Several months later the union attempted to reinstate the presettlement charges. Our court refused enforce-

---

**4.** The duty to bargain extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement. *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

**5.** We do not decide whether the manager's verbal summary of the requested items satisfies the union's right to be provided with requested information "relevant and necessary to the bargaining function." The Board has held that an on-premise examination of brief documents plus notetaking satisfies this requirement. Abercrombie & Fitch Co., 206 N.L.R.B. 109

(1973). In *NLRB v. Tex-tan, Inc.*, 318 F.2d 472, 478 (5th Cir. 1972), the Fifth Circuit found that the union's demand that records be provided in a "organized fashion" was unreasonable and that the company's "unqualified offer" to "see and copy any of its records" met the union's rights to be provided with information. *But see, e.g., Curtiss-Wright Co. v. NLRB*, 347 F.2d 61, 68 (3d Cir. 1965), where the court found that "merely meeting and conferring without prior exchange of requested data, where such is relevant, does not facilitate effective collective bargaining and therefore does not meet the requirements of sec. 8(a)(1) and (5)."

ment of the Board's order finding a violation and stated:

> Furthermore, the union was not only bound by its agreement to withdraw the charges with prejudice, which prohibited the reinstatement of the charges, but it was estopped from doing so. The union represented to the company that it was withdrawing the charges with prejudice, and it intended for the company to rely on such representations. The company did rely on them and changed its position to its detriment, with a corresponding benefit to the union. The union was and is estopped from reinstating the withdrawn charges. Also, the Board is legally and morally bound by the withdrawal agreement, because it approved the agreement, through its duly authorized regional director, who acted within the scope of his authority and who at the same time certified the union as the bargaining agent as required by paragraph 6 of the stipulation. This made the Board a party to the agreement.

579 F.2d at 1306–07. The Board is, therefore, capable of being bound by settlement agreements that it participates in and approves. If the parties perform the agreement, as they did in the present case, the Board should abide by the agreement. The Board should not be allowed to ignore the agreement and penalize the party for doing precisely that which it has ordered.

 The second question to be answered in this case is whether a right that is granted to the unions by the NLRA may be waived in a settlement agreement. This question must also be answered in the affirmative. The Supreme Court has indicated that the union's right to information may be expressly waived.[6] In *Prudential Insurance Co. of America v. NLRB*, 661 F.2d 398, 400 (5th Cir. 1981), this court held that the *Weingarten* right to have a union representative present at an investigatory interview may be waived by a union contract, even though the *Weingarten* right

"plainly effectuates the most fundamental purpose of the Act." The court there reasoned that other congressionally given fundamental rights, such as the right to strike, may be bargained away contractually by the union. *Id.* at 400. The same reasoning applies to settlement agreements approved by the Board. A settlement agreement by its very nature requires concessions on both sides. The purpose of the settlement is to end all labor disputes and, so far as possible, to extinguish all elements giving rise to them. *Wallace Corp. v. NLRB*, 323 U.S. 248, 253–54, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944). Courts that have invalidated a clear contractual waiver of an employee's individual rights have done so only when the waiver is that of the employee's right to exercise his basic choice of a bargaining representative. *Prudential Insurance Co.*, 661 F.2d at 400; see also *NLRB v. Magnavox Co.*, 415 U.S. 332, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974). The union is therefore able to waive its right to information during settlement negotiations.

 We hold that the settlement agreement waived the union's right to information that is relevant and necessary to its bargaining function and that the Board, bound by the settlement agreement, is estopped from prosecuting any alleged violation of that right.

We set aside the Board's August 27, 1980, decision and order in the Charles Gottschalk and Mickey Martin cases.

ENFORCEMENT DENIED.

---

6. See *NLRB v. Acme Industrial Co.*, 385 U.S. at 435, 87 S.Ct. at 567. In discussing the Seventh Circuit's refusal to enforce the Board's order to provide the requested information, the Court stated: "It did not question the relevance of the information nor the finding that the union had not expressly waived the right to the information."