**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHWESTERN BELL TELEPHONE CO., Respondent.**

**Nos. 78–1911, 78–1914.**

United States Court of Appeals, Fifth Circuit.

March 29, 1984.

Elliott Moore, Deputy Assoc. Gen. Counsel, Stanley R. Zirkin, James D. Donathen, N.L.R.B., Washington, D.C., for petitioner.

William N. Wheat, Southwestern Bell Telephone Co., James Shatto, Houston, Tex., for respondent in both cases.

Neta Frazier Seiber, Houston, Tex., for respondent in No. 78–1914.

Before REAVLEY, TATE and GARWOOD, Circuit Judges.

REAVLEY, Circuit Judge:

The National Labor Relations Board (NLRB or the Board) petitions this court to adjudicate Southwestern Bell Telephone Company (Bell or the Company) in civil contempt for four separate violations of two consent judgments we entered in 1978. Bell denies that it had engaged in contumacious conduct. The matter was referred to a special master, Administrative Law Judge Dee C. Blythe, who heard evidence and filed recommended findings and conclusions holding Bell in contempt on all four violations alleged by the Board. Bell contests most of the special master's findings of fact, disputes his conclusion that the Company's conduct violated the 1978 consent judgment, and objects to a number of the suggested sanctions. The Board objects only to the special master's failure to include a prospective fine among his recommended sanctions. We uphold the

special master's findings and conclusions and, with minor modifications, adopt the remedies he suggested.

## I. *Background*

In late 1977, Bell settled a charge brought by the union [1] representing certain of its employees by stipulating to entry of two consent orders by the NLRB and to entry of consent judgments of this court enforcing those orders. The Board issued the resulting consent orders on February 1, 1978, and we granted an appropriate petition to enforce the orders, entering the two requested consent judgments on May 16, 1978. One, to which we will refer as the Representation Judgment, required among other things that Bell "cease and desist from"

(a) Discouraging or intimidating any employee from requesting union representation or in any way interfering with an employee's right to engage in concerted activities for mutual aid or protection, during an interview if the employee has reasonable grounds to believe that the matters to be discussed may result in his being subject to disciplinary action.

.... [or]

(e) In any other manner or by any other means restraining and coercing employees in the exercise of their rights guaranteed by Section 7 of the National Labor Relations Act.

The other consent judgment (the Information Judgment), required that the Company [m]ake available to the [union] to read and inspect during normal business hours on company premises ... any material contained in the personnel history files of bargaining unit personnel. It is understood that the [union] may not remove said items from company premises or make copies thereof, but that all such items shall be made available to the [union] for use at any step of the grievance proceedings including a hearing before an arbitrator. Any such items introduced in a hearing before an arbitrator shall be made available only subject to an appropriate protective order guaranteeing its confidential nature.[2]

■ The Board now alleges that Bell violated the Representation Judgment by denying "effective" union representation during three investigatory interviews in 1980 and that the Company violated the Information Judgment during a 1981 employee grievance hearing. The special master correctly put the NLRB to the burden of justifying an adjudication of civil contempt by clear and convincing evidence, *see Florida Steel Corp. v. NLRB*, 648 F.2d 233, 236 (5th Cir.1981); *NLRB v. Southwire Co.*, 429 F.2d 1050, 1053 (5th Cir. 1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 932, 27 L.Ed.2d 218 (1971), and found that it had successfully met that burden in proving all four alleged violations. We review his findings of fact only for clear error. Fed.R.Civ.P. 53(e)(2); *Florida Steel*, 648 F.2d at 236; *NLRB v. J.P. Stevens & Co.*, 538 F.2d 1152, 1160–61 (5th Cir.1976).

## II. *The Right to Representation*

The Supreme Court held in 1975 that section 7 of the National Labor Relations Act (NLRA), 29 U.S.C. § 157 (1976), extends to an employee the statutory right "to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline ...." *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 256, 95 S.Ct. 959, 963, 43 L.Ed.2d 171 (1975). Stated positively, *Weingarten* affords to employees the right to union representation at investigatory interviews. The Court outlined the "contours and limits" of the right to union representation in five particulars, noting among them that "[t]he employer has no duty to bargain with the union representative at an investigatory in-

---

**1.** Communications Workers of America, Local 12222, AFL–CIO.

**2.** The Information Judgment also required Bell to

[m]ake available a duplicated copy of the contents of a personnel history file of bargaining unit personnel to the employee-grievant in question upon presentation of a written request by said employee-grievant.

terview." In its very next breath, however, the Court defined the role of the union representative by quoting from the Board's brief:

The representative is present to assist the employee, and may attempt to clarify the facts or suggest other employees who may have knowledge of them. The employer, however, is free to insist that he is only interested, at that time, in hearing the employee's own account of the matter under investigation.

*Id.* at 260, 95 S.Ct. at 965. *Weingarten* stated the law in 1978, when the consent judgments were entered, and in 1980, when the three alleged representation violations took place.

### A.

Kenneth Hill, a first line supervisor, called cable-splicers Ronald Borges and Troy Garner to an investigatory interview on April 16, 1980, on allegations that they had falsified their time reports the day before. Hill had been asked to arrange the meeting by his superior, Charles Reicher. According to Reicher and Hill, Reicher told Hill to have a union representative at the meeting, and Hill obeyed by suggesting to Borges and Garner a few minutes before the meeting that they get Larry Krug, a union job steward, to join them at the interview. According to Borges and Garner, Garner asked if Krug could attend, and Hill responded that he could, but only as a witness. The facts surrounding Krug's role at the meeting are disputed. The two employees and Krug testified before the special master that Reicher opened the interview by saying that Krug was present only as a witness, and that throughout the meeting he repeatedly responded to Krug's efforts to participate by silencing him. They agreed that Krug was able to make a few comments, but that he had generally been stifled in his efforts to speak. The meeting lasted some 45 minutes before Reicher announced a break and left the room to call Al Curry, the supervisor who had ridden in the truck with Borges and Garner the day before, to verify the time discrepancies. According to Borges, Garner, and Krug, Reicher returned ten minutes later, asked if the employees had stopped at the bank on company time, and, upon hearing that they had, announced that they would be suspended for three days. After announcing the discipline, Reicher closed the meeting by asking if anyone had anything to add; no one did, although Krug may have responded that nothing need be said since Reicher had already made up his mind.

Reicher and Hill recalled the meeting quite differently. They testified that they never told Krug he was there only as a witness. The union steward was allowed to participate generally, but was occasionally asked to confine himself to the subject when his comments wandered to irrelevant topics. Finally, Reicher testified that he had asked for additional comments after the break, but was unsure whether this was before or after he announced the suspension.[3]

The special master credited the testimony of the employees and Krug over that of the supervisors primarily because of notes taken by management during two grievance hearings concerning the alleged denial of union representation on April 16: at the first grievance level, Reicher noted under "Facts in the Case" that Krug had been told he was present at the interview only as a witness; at the second, the district manager's secretary took notes that included, as an item under "Management's Position," that Borges and Garner had "possibly" been denied union representation. The only explanation by Reicher and the district manager was that these entries had both been made under the wrong heading—they actually reflected the union's position. The special master found that Krug had been told he was present only as a witness and had not been allowed to participate at the interview. We find no clear error.

---

**3.** The special master understood Reicher's position to be that he asked for comment before announcing the discipline. *Cf.* Tr. 137–38.

## B.

Billy Cook, a cable repairman, had an altercation with his immediate supervisor, Antonio Tamame, on Saturday morning, September 20, 1980, over Tamame's classification of Cook's absence from work the day before. Tamame was somewhat shaken by Cook's angry threats and called his second-line supervisor Wesley Latimer at home. Latimer calmed him, told him to write down what happened, and asked that Tamame stay away from Cook the rest of the day. The following Monday morning, September 22, Latimer called Tamame and Cook to an investigatory meeting. Union steward Danny St. Andrie was asked to attend the meeting either by Tamame at Latimer's direction, by Cook, or by both. Henry McGowen, another supervisor, also attended the meeting as an observer to see how such interviews were conducted.

Details of the meeting are much in dispute. The special master found that Latimer began by explaining that the purpose of the meeting was to investigate the Cook-Tamame altercation two days before and that some form of discipline might be imposed. He read part of Tamame's statement and asked Cook for his side of the story. Cook denied that any threats had been made at all. St. Andrie tried at some point to interject a question, but was silenced by Latimer, who said that he was only an observer and was to remain quiet. St. Andrie made no further attempts to participate. Latimer eventually announced that Cook would be suspended indefinitely. He asked Cook and St. Andrie if they understood; they said they did, and Latimer closed the meeting.

Latimer and McGowen testified, however, that St. Andrie opened the meeting with some irrelevant matter, and that Latimer stopped him, explaining that they were assembled on a more serious matter. Latimer told St. Andrie at the outset, according to the supervisors, that he was there as a union representative, that Latimer wanted to elicit Cook's version first, and that St. Andrie could ask questions or make comments afterward. Latimer never silenced St. Andrie during the meeting, and after announcing the suspension he asked if anyone had anything else to add. Finally, Latimer explained that his decision to suspend Cook was based on Tamame's statement and the absence of anything more than a blanket denial from Cook. Again, we find no clear error in the special master's findings of fact.

Cook's suspension and eventual discharge were the subject of several meetings in the following weeks, during all of which he was allowed at least one fully participating union representative. The matter was arbitrated according to the collective bargaining agreement, with Cook enjoying full union representation during the two-day hearing. The award upheld the discharge.

## C.

Repairman Carlos Quezada failed to follow Bell's "call-back" procedure on October 14, 1980.[1] Supervisor Gloria Gutierrez was told of the omission and, after checking with the customer involved, called her supervisor, Roy Casey. Casey checked Quezada's file and agreed that discipline might be appropriate: Casey thought suspension for the rest of the day would suffice, while Gutierrez considered a full day of suspension more appropriate. Casey ended the conversation by cautioning Gutierrez to hear Quezada's explanation of the matter.

Gutierrez called a meeting with Quezada ten days later. She asked a fellow supervisor, Jim Stockton, to attend, and she either invited the union steward, Gary Miller, or asked Quezada to bring him. Gutierrez began the meeting by announcing that it was disciplinary and that it involved Quezada's failure to follow the call-back procedure. She showed Quezada the "trouble"

---

**4.** After a repairman completes a job, he must call the company's dispatcher for a new assignment. The dispatcher then calls him back at the completed job to insure that the repaired phone is working and to give the repairman a new job. In this way Bell keeps track of the progress of its repairmen through the day.

ticket representing the repair and asked why he had not been at the job to receive the call-back. Quezada could not remember the job ten days earlier. Again, stories diverge. Miller and Quezada testified that the steward immediately began asking questions, but Stockton angrily stopped him short, telling him that this was management's meeting at which he was present only to observe. Miller asked Gutierrez if she agreed that he was only a witness; she did. Gutierrez and Stockton recalled that Gutierrez had already announced Quezada's suspension by the time Miller spoke. Stockton admitted silencing Miller, but testified that it was after a series of questions and long after the suspension had been announced. The union appealed the suspension by grievance, during which it did not argue that Quezada had been denied representation. The discipline was eventually rescinded, and Quezada received back pay for the partial day; his employment record still contains note of the suspension.

The special master credited the employees' version, reasoning that Gutierrez' announcement at the outset that the meeting was disciplinary showed that she thought that no *Weingarten* right of representation was involved. He therefore found that Bell denied Quezada "effective assistance of his Union representative" by relegating Miller to the role of silent witness. Bell complains that the special master failed to make findings on certain events as to which the evidence was undisputed; to the extent that we agree, we have described the events in question. We find no clear error, however, in the special master's finding that Miller was silenced at the October 24 meeting.

◼ Bell argues that Quezada had no right to union representation at the meeting because it was not investigatory. In *Anchortank, Inc. v. NLRB*, 618 F.2d 1153 (5th Cir.1980), we upheld the Board's view that an employee has no section 7 right to union representation at a meeting "conducted solely to inform the employee of, and acting upon, a predetermined disciplinary decision." *Id.* at 1168. *See Baton*

*Rouge Water Works Co.*, 246 N.L.R.B. No. 161, 103 L.R.R.M. 1056 (1979). We explained that an employee enjoys the *Weingarten* right to representation

in any interview which he reasonably believes might result in disciplinary action except when the employer (1) has, before the interview, reached a decision to discipline the employee, (2) conducts the interview solely with the purpose of informing the employee of that decision, and (3) conducts that interview without going beyond that purpose.

618 F.2d at 1168 n. 28.

The special master found, and we agree, that part of the purpose for the October 24 meeting was to elicit Quezada's explanation for violating the call-back policy, and that the sanction to be imposed had not yet been finally determined before the meeting began. Not only did the meeting's purpose exceed that of merely announcing the suspension, but it was conducted in a way that went beyond imposing discipline—Gutierrez clearly asked Quezada for his explanation before announcing the suspension. Thus, the meeting was partially investigatory both in purpose and in fact. *Anchortank* therefore requires the conclusion that Quezada was entitled to union representation.

### D.

◼ Bell contends that the conduct of its supervisors in each of these three episodes should not ground an adjudication of contempt because it did not violate the terms of the Representation Judgment. It did not "discourag[e] or intimidat[e]" the employees from requesting representation, nor did it "interfer[e]" with their right to "engage in activities for mutual aid or protection." Instead, Bell either secured the presence of the union stewards or allowed them to attend the meetings. *Weingarten* was its only guide, insists the Company, and the decision did not by terms extend to employees any right to "effective representation." Bell claims to have honored both *Weingarten* and the letter of our 1978 judgment by admitting the union represent-

atives as passive observers of its investigative interviews.

The Board responds by citing two cases construing *Weingarten*. In the first, the Ninth Circuit held that *Weingarten* is violated by an employer who allows a union steward to attend an investigatory interview but requires that the steward remain silent. *NLRB v. Texaco, Inc.*, 659 F.2d 124 (9th Cir.1981). In the second, this court further defined the union representative's role by holding that the employer may achieve an orderly interview by hearing the employee's account first and leaving to the end of the meeting the representative's "additions and clarifications." *Southwestern Bell Telephone Co. v. NLRB*, 667 F.2d 470, 473–74 (5th Cir.1983).[5] Bell insists, however, that these explications of *Weingarten* came after the Representation Judgment was entered and cannot be considered in construing its terms—terms that the Company says are too vague to support an adjudication of contempt. It also argues that *Texaco* and our *Southwestern Bell* decision were decided after the three interviews in this case took place and were therefore not yet available to guide the Company in the conduct of the meetings.

We need not consider the retroactive applicability of *Texaco* and *Southwestern Bell*, for we find *Weingarten* quite clear in its requirement that the union representative be afforded some opportunity to participate in the investigatory interview:

> A single employee confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors. A knowledgeable union representative could assist the employer by eliciting favorable facts, and save the employer pro-

duction time by getting to the bottom of the incident occasioning the interview. Certainly his presence need not transform the interview into an adversary contest.

420 U.S. at 262–63, 95 S.Ct. at 966. Thus, one of the major purposes articulated in *Weingarten* for affording employees a section 7 right to union representation is "to eliminate the 'inequality of bargaining power between employees ... and employers.' "[6] *Id.* at 262, 95 S.Ct. at 966 (quoting section 1 of the NLRA, 29 U.S.C. § 151) (omission in original). Put simply, the union representative is there to help the employee in his effort to vindicate himself. *See id.* at 263–64, 95 S.Ct. at 967. *Weingarten* did quote language in the NLRB's brief that authorized an employer to "insist that he is only interested, at that time, in hearing the employee's own account of the matter under investigation." But Bell cannot have reasonably read the case to leave open the possibility that the employer might foreclose the union representative from any participation. *Texaco* did no more than recognize that such a reading is "wholly contrary to other language in the *Weingarten* opinion [quoted above] which explains that the representative should be able to take an active role in assisting the employee to present the facts." 659 F.2d at 126.

■ Finally, Bell argues that our Representation Judgment was too vague in its prohibition to support an adjudication of contempt. Having already recited the obvious mandate of *Weingarten* that the union representative be allowed to participate at some point in the investigative interview, we can only read our 1978 judgment to incorporate that requirement by its use of language lifted directly from the *Weingarten* opinion and by its reference to the section 7 rights of Bell's employees. The

---

**5.** We carefully preserved the holding in *Texaco* that the union representative cannot be relegated to the role of passive observer. *Id.* 474 n. 3.

**6.** The other purpose mentioned in *Weingarten* for extending a right to representation is to enable the union to safeguard the interests of

the entire bargaining unit; the representative's presence at investigatory interviews "is an assurance to other employees that they, too, can obtain his aid and protection if called upon to attend a like interview." *Id.* at 261, 95 S.Ct. at 965. A silent observer offers little in the way of "aid and protection."

prohibitions contained in judgments or orders that may later ground contempt proceedings should no doubt be as particular as possible so that those bound might know what conduct is forbidden.[7] *See Burr v. NLRB*, 321 F.2d 612, 625 (5th Cir.1963); *NLRB v. Athens Manufacturing Co.*, 163 F.2d 255 (5th Cir.1947). But those same prohibitions cannot be written so narrowly as to "invite easy evasion." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949). Bell knew in 1980 that it labored under a consent judgment that forbade violations of section 7 generally and of the *Weingarten* right to representation in particular. We will enforce our judgment.

### III. *The Right to Information*

The Board has also alleged that Bell violated the Information Judgment in connection with a grievance in April 1981.[8] Consumer Service Representative Christine Simmons had received a one-day suspension for absenteeism. She grieved the suspension at a meeting on April 28, 1981. Arline Jensen, the union steward representing Simmons, argued that the employee had been ill and that she had been treated more harshly than others in her work unit who had attendance problems. After district manager Walter Lackey announced that he would not overturn the suspension, Jensen asked to look at the attendance records of other employees in Simmons' unit to help substantiate the claim that Simmons was treated unfairly. Lackey denied the request, and Jensen replied that she would repeat it in writing after the meeting.

Shortly after the meeting, Jensen handed Lackey a written request to review the attendance records of other employees in Simmons' unit. The request was on a union form, reciting as boilerplate in its first

paragraph that the information was requested in connection with a grievance and was "absolutely essential to the intelligent handling of the case by the Union." The second paragraph of the form was comprised largely of a space several lines long in which Jensen had written her request: "To review the attendance records of those service representatives in Unit 5–4 ...." The request was denied.

Bell argues that Lackey understood the request to be for copies of the records, not merely to review them, and that the request was denied on that understanding. The Information Judgment extends to the union the right to review the records—copies are available only on request of the employee involved, and Bell insists that Jensen's request was eventually granted when the Company learned from the Board's August 1981 complaint that she had asked only to review the records. The Board does not seek in this case to pursue an obligation to provide information not embodied in the consent judgment. *Cf. Southwestern Bell*, 667 F.2d at 474–76. Instead, it asks only that we enforce that judgment's limited requirement that Bell allow the union to review certain records upon request. The special master found that the Company denied a request that could hardly have been more clear in seeking only a review of the records. We agree.

### IV. *The Contempt Sanction*

Finally, Bell argues that contempt sanctions ought not be imposed, peppering its brief with protestations of its good faith. We are somewhat sympathetic, for much of the conduct alleged by the Board seems comparatively benign. But this is civil contempt, not criminal. The employer's intent is therefore not for us to consider; rather, we must simply determine

7. We note, however, that the 1978 judgments and the orders they enforced were entered with Bell's consent. The Company might well have expressed its concern six years ago when it agreed to the prohibitions now challenged as overly vague. *NLRB v. American Mfg. Co.*, 132 F.2d 740 (5th Cir.1943); *see NLRB v. Alterman*

*Transport Lines, Inc.*, 587 F.2d 212, 215–16 (5th Cir.1979).

8. Some facts surrounding this episode are disputed. Upon reviewing the record, we find no clear error in the special master's findings and state the facts accordingly.

whether our judgments were in fact violated. *NLRB v. Crown Laundry Dry Cleaners, Inc.,* 437 F.2d 290, 293 (5th Cir.1971); *see Florida Steel Corp. v. NLRB,* 648 F.2d 233, 236 (5th Cir.1981). The special master's findings are not clearly erroneous, they are supported by substantial evidence, and they clearly and convincingly demonstrate that Bell has violated our 1978 judgments. *See NLRB v. J.P. Stevens & Co.,* 538 F.2d 1152, 1160–61 (5th Cir.1976). We must therefore adjudge the company in civil contempt. *Crown Laundry,* 437 F.2d at 293.

## V. *Remedies*

The special master has recommended several remedies by which Bell will purge itself of contempt. For the most part, the remedies are appropriate and will be made a part of our order. We agree, however, with a few of Bell's objections.

 The special master suggests that we detail the prohibition expressed in more general terms in our 1978 judgment. He proposes that Bell be ordered not to deny any employee

> his or her right to union representation at an investigatory interview which the employee reasonably believes might result in disciplinary action by silencing the union representative, telling the representative that he or she is only a witness or observer, or in any manner preventing or discouraging the union representative from providing assistance to the employee being interviewed.

We held in *Southwestern Bell,* however, that an employer is free to hear the employee's explanation first and to delay until the end of the investigatory interview the union representative's additions and clarifications. 667 F.2d at 473–74. *See Weingarten,* 420 U.S. at 260, 95 S.Ct. at 965. We will amend the proposed remedy to reflect that freedom.

The proposed remedies also provide Billy Cook with back pay covering the period between his suspension—imposed after an interview at which Cook's *Weingarten* right was denied—and his eventual and lawful discharge. This we decline to do. Cook's violent conduct fully justified the suspension. Although Bell denied Cook's union representative an active role at the investigatory interview, the employee was given a full opportunity to explain the matter. Nevertheless, Cook offered nothing but a blanket denial that he had threatened to kill his immediate supervisor, and a close review of the record and of the special master's findings reveals nothing that St. Andrie might have offered had he not been silenced. The Board considers Cook's suspension to have been based in part on information gathered at the tainted interview and cites several of its decisions imposing on the employer the burden of showing that the discipline was not based on information obtained at the interview. *E.g., Illinois Bell Telephone Co.,* 251 N.L.R.B. No. 128, 105 L.R.R.M. 1236 (1980), *enf'd in part and remanded in part,* 674 F.2d 618 (7th Cir.1982). Assuming without deciding that the employer properly bears this burden, we hold that it is satisfied here. *Illinois Bell* provides good contrast. There, the employee confessed at the interview;[9] here, Cook simply denied the charge. With Tamame's statement in hand, Bell learned nothing from this denial. Our remedy will not include back pay for Cook.

Finally, we note that the Board has agreed to limit Bell's obligation to issue written instructions to its supervisors to cover only the Houston area. Our order reflects the change. In all other respects, the remedies will remain those proposed by the special master.

We therefore approve and adopt the report of the special master recommending that Bell be held in contempt. The motion of the Board for adjudication of Bell in civil contempt is granted, and we direct Bell to purge itself of contempt by compliance with the remedies set forth in the order that accompanies this opinion.

---

**9.** Yet the Seventh Circuit remanded on the issue because it could not say that the discharge stemmed solely from the interview. 674 F.2d at 621.

## ORDER

BY THE COURT:

This cause came on to be heard upon the petition of the National Labor Relations Board to adjudge Southwestern Bell Telephone Company (the Company) in civil contempt for having failed to comply with two consent judgments issued by this Court on May 16, 1978. Upon the Board's allegation that respondent had failed to comply with said judgments, the Court, on May 19, 1982, referred the matter for hearing to Administrative Law Judge Dee C. Blythe as special master. In consideration of the findings, conclusions, and recommendations contained in the special master's recommended decision and order filed with the Court on April 18, 1983, it is hereby

ORDERED AND ADJUDGED that respondent Southwestern Bell Telephone Company is in civil contempt for having violated the judgments entered by this Court on May 16, 1978; and

IT IS FURTHER ORDERED that Southwestern Bell Telephone Company, its officers, agents, representatives, successors, and assigns shall purge themselves of contempt by:

1. Fully complying with and obeying the judgments of May 16, 1978, and each of the provisions of the Board's orders thereby enforced, and not in any way by action or inaction commit, engage in, induce, encourage, permit, or condone any violation of said judgments;

2. Refraining from denying any employee his or her right to union representation at an investigatory interview that the employee reasonably believes might result in disciplinary action by denying the union representative any participation in the interview, by telling the representative that he or she is only a witness or observer, or by preventing or discouraging the union representative from providing such assistance to the employee being interviewed as is the employee's right under section 7 of the National Labor Relations Act;

3. To the extent it has not already done so, making employees Ron Borges, Troy Garner, and Carlos Quezada whole for any loss of wages and benefits they suffered as the result of the Company's unlawful conduct, together with interest thereon, said amounts, unless agreed upon, to be computed by the Board in a supplemental proceeding, subject to review by this Court;

4. Expunging from its records any adverse references or notations based on conduct that led to the suspensions of employees Borges, Garner, and Quezada;

5. Refraining from refusing to allow the Union, pursuant to this Court's May 16, 1978, judgments, to read and inspect, during normal business hours on Company premises, any requested information contained in the personnel files of bargaining unit employees that is relevant to a pending grievance;

6. Giving the Union the opportunity, upon request, to review the requested material contained in the personnel files of other employees in employee Christine Simmons' work group;

7. Upon request by the Union, reopening the grievance of employee Simmons regarding her suspension for absenteeism, meeting with the Union at the various steps of the grievance procedure as required by the applicable articles of the collective bargaining agreement between the Company and the Union, and waiving any time limits in said articles that might bar the reopening and processing of said grievance;

8. Refraining from interfering with, restraining, or coercing employees in the exercise of their rights under section 7 of the National Labor Relations Act;

9. Immediately posting in conspicuous places in all its Houston, Texas locations, including all places in such Houston locations where notices to employees are customarily posted, for a period of sixty (60) consecutive days, copies of the Court's contempt adjudication and of an appropriate notice in the form to be supplied by the Board and signed by an officer of the Company, which states that the Company has been adjudicated in civil contempt of this

Court for violating and disobeying and failing and refusing to comply with this Court's judgments, and that the Company will immediately undertake the action in purgation set forth in the contempt adjudication; maintaining said notices and copies of the adjudication in clearly legible condition throughout such posting period; and insuring that they are not altered, defaced, or covered by any other material;

10. Issuing written instructions to all supervisors at its Houston, Texas locations to comply with the provisions of the underlying judgments and this order, and to abide by the undertakings in the Board's notice, and requiring each supervisor to signify in writing that he or she had received such instructions;

11. Filing sworn statements with the Clerk of this Court and a copy thereof with the Director of the Board's Twenty-Third Region within ten days after the entry of adjudication and again at the end of the posting period, showing what steps have been taken by the Company to comply with the Court's direction;

12. Paying to the Board all costs and expenditures, including reasonable attorneys' fees, incurred by the Board in the investigation, preparation, presentation, and final disposition of this proceeding, said amount, unless agreed upon by the parties, to be fixed by the Court upon submission by the Board of a certified statement of costs and expenses.